Renee CECALA, Plaintiff,

v.

David B. NEWMAN; Cooperman Levitt Winikoff Lester & Newman, P.C., Defendants.

No. CV 04–02612–PHX–NVW.

United States District Court, D. Arizona.

May 2, 2007.

See also 40 Fed.Appx. 795.

Kraig J. Marton, David N. Farren, Jaburg & Wilk PC, Phoenix, AZ, for Plaintiff.

Brian Holohan, Brian Holohan Ltd., Phoenix, AZ, for Defendants.

**ORDER**

NEIL V. WAKE, District Judge.

Table of Contents

I. Factual Background ................................................. 1129

 A. NationsBank ................................................. 1130
 1. The Underlying Employment Dispute ........................ 1130
 2. Retaining Lawyer Newman ................................. 1130
 3. Mitigation of Damages ................................... 1130
 4. Litigation Strategy ..................................... 1131
 B. NASD Arbitration ........................................... 1131
 C. Cecala's Relationship with Newman .......................... 1132
 D. Malpractice Litigation ..................................... 1132

II. Summary Judgment Standard ...................................... 1132

III. Legal Malpractice in Arizona ................................. 1133
 A. Two Theories of Malpractice Liability ...................... 1133
 B. A Prima Facie Case ......................................... 1134
 1. Cognizable Injury ....................................... 1134
 2. Attorney Negligence Malpractice ......................... 1134
 3. Fiduciary Breach Malpractice ............................ 1134
 C. Trial Methodology .......................................... 1135
 D. Causation .................................................. 1136
 1. "But–For" Causation ..................................... 1136
 2. Proximate Causation and Foreseeability of the Injury .... 1137
 3. But–For Causation and Proximate Causation in Litigation
 Malpractice ............................................. 1138
 i. Subversion of the But–For Causation Requirement ....... 1138
 ii. The Judgment Error Rule, Speculativeness, and Lack of
 Foreseeability ........................................ 1139
 4. Fiduciary Breach Malpractice ............................ 1140

IV. Cecala's Second Amended Complaint .............................. 1140

V. Negligent Supervision .......................................... 1141

VI. Statute of Limitations ........................................ 1142
 A. The Amfac Cases: Errors in Litigation ..................... 1142
 B. Amfac Does Not Apply to Non–Litigation Injury .............. 1143
 C. "Unsound Mind" Tolling Does Not Apply ...................... 1144

1. The Meaning of "Unsound Mind" .....................................1144
2. Quantum of Evidence to Defeat Summary Judgment ...................1144
3. Insufficient Evidence of Inability to Understand Legal Rights .........1146
4. Insufficient Evidence of Inability to Manage Daily Affairs ............1147
 i. Expert Affidavits ..........................................1148
 a. Dr. Rutter. ...........................................1148
 b. Dr. Harrison .........................................1148
 c. Dr. Wilson ...........................................1149
 ii. Declarations of Family and Friends ..........................1149
 a. 1999 ................................................1150
 b. 2000 ................................................1150
 c. 2001 ................................................1151
 d. 2002 ................................................1151
 iii. Rule 56(c) Declarations .....................................1151
5. Conclusion ...............................................1152
D. Equitable Tolling Is Unwarranted ...................................1153

VII. Causation ......................................................1153
A. Cecala's Theory of Causation Is Insufficient ...........................1153
B. Procedural Issues..................................................1155
 1. Newman Carried His Initial Burden under Rule 56(c) .................1155
 2. Cecala's Supplemental Expert Affidavit Was Untimely ...............1156
C. Causation Evidence from Elliot's Affidavits ............................1158
 1. Newman's "Ineffective Representation" ............................1158
 2. Improper Selection of and Hostile Attitude Toward the NASD
 Arbitrators ......................................................1159
 3. Inadequate Discovery: Failure to File with the EEOC ...............1160
 4. Loss of a Procedural Advantage: Foregoing Litigation ...............1161
 5. Termination of the Representation ................................1162
D. Other Evidence of Causation ........................................1163
 1. Hostile Work Environment Sexual Harassment Claim ...............1163
 2. Disparate Treatment Claim......................................1164
 3. Evidence of Litigation Injury from Sexual Relationship ..............1164

VIII. Failure to Assert Retaliation ..........................................1165
A. Retaliatory Acts ...................................................1165
B. Constructive Discharge..............................................1166
 1. Prima Facie Case for Constructive Discharge .......................1167
 2. The Omitted Allegation of Constructive Discharge Is Not
 Economically Viable ..............................................1168
C. Failure to Mitigate.................................................1169
D. Lost Opportunity to Recover Nominal Damages at a Net Loss to the
 Client Is Not Actionable Malpractice ................................1169

Pending before the court are Defendants' Motion for Summary Judgment and Statement of Facts, as amended ("DSOF") (Doc. ## 171, 172, 246); Plaintiff's Response and Statement of Facts, as amended ("PSOF") (Doc. ## 193, 188, 220); and Defendants' Reply (Doc. # 206).

Also before the court are Plaintiff's Notice of Filing (Doc. # 224) and Defendants' Motion to Strike Cecala Declaration and Elliot Supplemental Affidavit (Doc. # 227).

The court has reviewed the parties' supplemental memoranda (Doc. ## 228, 229, 230) and the responses thereto (Doc. ## 236, 237, 238).

## I. Factual Background

Construing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in her favor, the admissible evidence shows the following.

## A. NationsBank

This is an action for legal malpractice arising out of an employment dispute between Plaintiff Renee Cecala ("Cecala") and her former employer, NationsBank ("Bank"), now Bank of America. Cecala began working for NationsBank in Charlotte, North Carolina in June 1994. (PSOF 19–20; DSOF Ex. 3, 4.) Cecala worked at various times in the capital markets, mortgage financing, and mortgage sales divisions of the Bank. (PSOF 19–20.)

### 1. The Underlying Employment Dispute

Cecala contends that NationsBank discriminated against her because of her sex. (*Id.* at 20.) She "was not compensated fairly, compared to others similarly situated at the Bank, and at other like institutions," and was denied promotions and deprived of human resources by Bank management. (*Id.* at 20–23; Ex. 18 at 2.) Cecala believes that she "flourished and even fostered growth and prosperity within two distinct departments" despite the "woefully inadequate support and resources she received." (*Id.* Ex 18 at 2.) In addition to general underpayment and lack of resources, Cecala alleges that she was "victimized by sexual harassment [and] a hostile work environment" at NationsBank. (Doc. # 193 at 3; PSOF 23–24.) The Bank's "oppressive and hostile work environment . . . caused her great physical and emotional distress." (*Id.* Ex. 18 at 2.)

From 1994 through 1996, Cecala lodged complaints with senior Bank management about "compensation, promotions, and resources," but NationsBank did not address her concerns. (*Id.* at 21.)

### 2. Retaining Lawyer Newman

In January 1997, Cecala hired New York attorney David B. Newman of the law firm of Cooperman Levitt Winikoff Lester & Newman, P.C. ("Cooperman Levitt"), to represent her in negotiations with Nations-Bank. (Doc. # 171 at 3.) Newman sent a letter to the president of NationsBank Capital Markets on February 20, 1997, briefly describing Cecala's concerns and expressing his desire "to discuss this matter with you with the hope of resolving these issues short of further legal action." (DSOF Ex. 5.) The Bank replied: "We view this is an internal matter and will work with Ms. Cecala to address any concerns she may have." (*Id.* Ex. 6.)

Bank officials did meet with Cecala on several occasions. (DSOF Ex. 1, RC–00368–72 (arbitration transcript hereinafter referenced by Bates number).) In an effort to resolve Cecala's allegations of gender discrimination, the Bank promised her a "meaningful role" in the mortgage finance department, and offered a $10,000 increase in compensation to match her alleged male comparator. (RC–00370.) Cecala refused the offer as unresponsive to her concerns, unreasonable, and unfair. (RC–00371.) Cecala alleges that Nations-Bank retaliated by, among other things, "interrogat[ing]," "embarrass[ing]," "ostraciz[ing]," "ignor[ing]" and "[freezing her] out of the work she had been doing." (Doc. # 193 at 3; PSOF 18.) "These conditions became so intolerable that, in March 199[7], she resigned." (Doc. # 193 at 3.) Cecala did not seek legal advice from Newman before making this decision. Whether Cecala voluntarily resigned or was "constructively discharged" for complaining about her working conditions is disputed by the parties, as discussed below. (Doc. # 229 at 3–7.)

### 3. Mitigation of Damages

Cecala interviewed for an investment banking job at Goldman Sachs, New York, shortly after resigning from NationsBank. (PSOF 1.) Although she now denies it (*Id.*

at 1–2), Cecala originally testified that Goldman Sachs offered to hire her as an investment banker. (RC–00748–49.) Cecala declined the offer upon learning that her salary and benefits at Goldman Sachs would not exceed the compensation provided by NationsBank, which she viewed as "below market," "discriminatory," and "one of the reasons [she] resigned from NationsBank" in the first instance. (RC–00749; PSOF 2.) Cecala does not recall discussing the Goldman Sachs offer or any other issue related to mitigation of damages with her attorney. (*Id.* at 2.)

### 4. Litigation Strategy

Lawyer Newman commenced arbitration under the auspices of the National Association of Securities Dealers ("NASD") in September 1997. (Doc. # 171 at 5.) Newman's choice of forum was influenced by the arbitration agreement executed by Cecala in connection with her employment at NationsBank (*Id.* at 5.) The Statement of Claim alleges, among other things, a right of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, for disparate pay and career advancement relative to Cecala's male colleagues, and hostile work environment sexual harassment. (DSOF Ex. 9.) Newman's initiatory pleading did not include a claim for retaliation or an allegation of constructive discharge. (Doc. # 193 at 16.)

Newman and his associate Kenneth Rubinstein also contemplated filing a charge against NationsBank with the Charlotte District Office of the Equal Employment Opportunity Commission ("EEOC"). In the summer of 1997, Newman and Mr. Rubinstein drafted an affidavit and sought local North Carolina counsel for that purpose. (Doc. # 171 at 6; 182 Ex. B Attach. 1–2.) Cecala's lawyers never lodged a charge with the EEOC. (PSOF 4; Ex. 14 at 12.)

### B. NASD Arbitration

Pursuant to NASD procedure, a three-member panel convened in Charlotte, North Carolina, for 18 full days (36 half-day sessions) of arbitration between August 6, 1998, and October 20, 1999 (Case No. 97–04551). (DSOF Ex. 14 at 3–4.) Newman represented Cecala before the tribunal for 34 of the half-day sessions, until June 21, 1999, when Cecala formally discharged him under disputed circumstances. (Doc. # 193 at 5.) Cecala demanded her client file shortly thereafter, but Newman refused to return it until 2000 because of a billing dispute. (Doc. # 171 at 6; Cecala Dep. Jan. 5, 2007 p. 302.) Cecala attempted to retain a new lawyer in July 1999. (Doc. # 182 Ex. B, 1.) She was unsuccessful, and Cecala represented herself during the last two arbitration hearings in October 1999. (DSOF Ex. 14 at 2; Doc. # 246; Doc. # 171 at 6.)

Cecala's testimony in the arbitration hearing was contradicted by witness after witness from the Bank. She suffered a withering cross-examination gravely injurious to specific assertions and to her credibility in general. (*E.g.*, RC–00479–81; RC–00658; RC–00664; RC–007611–13; RC–01129–34.)

The NASD arbitrators rendered their award on February 10, 2000, finding in favor of NationsBank on all claims. Cecala attempted to vacate the adverse decision of the arbitral tribunal in the federal courts pursuant to Section 10(a) of the Federal Arbitration Act, 9 U.S.C. (Doc. # 182 Ex. B at 2.) She was unsuccessful. *Cecala v. NationsBank Corp.*, No: 3:00–mc–00039 (D.N.C. Apr. 4, 2001) (denying the motion to vacate); *Cecala v. Nations-Bank Corp.*, 40 Fed.Appx. 795, 796 (4th Cir.2002) (upholding the district court's decision). The NASD award became finally enforceable on November 21, 2002. (Doc. # 65 at 2.)

### C. Cecala's Relationship with New-man

Cecala alleges that she had a non-consensual, sexual relationship with lawyer Newman. She contends further that their "relationship . . . adversely affect[ed] [Newman's] legal representation." (Doc. # 193 at 4.) Cecala submits that Newman "engaged in sexual conduct, including sexual contact" with her on multiple occasions and in various locations from August 1998, through June 14, 1999, "as a condition to perform legal services" and without her effective consent. (*Id.* at 15–17.)

Cecala terminated her sexual relationship with Newman on the eve of the June 1999, arbitration hearing. "Just before the hearing date Ms. Cecala reached her breaking point. She became so distraught and upset with Newman that she fired him—or, more accurately, his conduct caused her to fire him—preferring to go it alone rather than continue to endure his demands for sex." (*Id.* at 5.) Newman denies that he had a sexual relationship with Cecala, and he offers an alternative explanation for his discharge in a June 17, 1999 memorandum. (DSOF Ex. 3 at 2; Ex. 10.)

Cecala was severely affected by her relationship with Newman and her litigation losses both in the NASD arbitration and in the federal courts. (PSOF 25–29.)

### D. Malpractice Litigation

Cecala first considered taking legal action against her former attorney between December 1999 and January 2000. (DSOF Cecala Dep. 163.) Cecala contacted the North Carolina law firm of Ferguson Stein Chambers in "early 2002, to discuss representation in pursuing Mr. Newman for malpractice," but she did not retain counsel at that time. (Doc. # 182 Ex. B, 2.)

Cecala filed a pro se lawsuit for malpractice against Newman and his law partners at Cooperman Levitt in the Maricopa County Superior Court on April 18, 2003. (DSOF Ex. 16.) The case was dismissed for lack of prosecution. (Doc. # 171 at 7.)

After she retained counsel, Cecala resumed legal action against her former attorney and his firm in federal court on November 21, 2004. (Doc. # 1.) The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

## II. Summary Judgment Standard

Rule 56(c), Fed.R.Civ.P., provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court must evaluate a party's motion for summary judgment construing the alleged facts with all reasonable inferences favoring the nonmoving party. *See Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1117 (9th Cir.2001). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Conclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nature of this responsibility varies, however, depending on whether the legal issues are ones on which the movant or the non-movant would bear

the burden of proof at trial. If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may carry its initial burden of production under Rule 56(c) by producing "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105–06 (9th Cir.2000); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate against a party who "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538, (1986) (nonmovant's showing of "some metaphysical doubt" as to material facts insufficient); *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir.1994). Summary judgment is not appropriate when the non-moving party identifies or produces evidence from which a reasonable juror, drawing all inferences in favor of the non-moving party, could return a verdict in the nonmoving party's favor. *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir.1999).

## III. Legal Malpractice in Arizona

The court has not been favored with any briefing as to whether the substantive law of Arizona or that of any other jurisdiction in which Newman's conduct occurred supplies the rule of decision in this diversity action. The court therefore takes it that Arizona law applies and that Cecala and Newman have waived any different position. (Doc. ## 171, 193.) Arizona adheres in all significant respects to the majority view of legal malpractice. Therefore, it is unlikely that application of the law of New York or North Carolina would lead to a different result.

### A. Two Theories of Malpractice Liability

■■■ In Arizona, "an attorney must act for his client in a reasonably careful and skillful manner in light of his special professional knowledge." *Martin v. Burns*, 102 Ariz. 341, 343, 429 P.2d 660, 662 (1967). A lawyer is also a fiduciary with a duty of loyalty, confidentiality, and obedience to the client. *In re Estate of Shano*, 177 Ariz. 550, 557, 869 P.2d 1203, 1210 (Ct.App.1993). Indeed, "[t]he Arizona courts have long held that an attorney is bound to discharge his duties to his client with strictest fidelity and to observe the highest and utmost good faith." *Talbot v. Schroeder*, 13 Ariz.App. 230, 231, 475 P.2d 520, 521 (1970); *see Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J.).

■■■ The duties of care and loyalty, though coextensive, create two independent bases of tort liability in Arizona. *See Barmat v. John & Jane Doe Partners A–D*, 155 Ariz. 519, 522, 747 P.2d 1218, 1221 (1987); *Schroeder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114 (Ct.App.1984). A duly licensed attorney may be liable in Arizona for departing from the applicable standard of care under the law of negligence. As a

fiduciary, the lawyer may also be liable for breaching his duties of loyalty and confidentiality. Leading commentators distinguish the bases of malpractice liability as follows: "[A]n attorney's duties to a client include two obligations: (1) competent representation and (2) compliance with fiduciary obligations. The fiduciary obligations set a standard of 'conduct,' analogous to the standard of 'care,' which pertains to the requisite skill, knowledge and diligence. Thus, the standard of care concerns negligence and the standard of conduct concerns breach of loyalty or confidentiality." 2 Ronald E. Mallen & Jeffery M. Smith, *Legal Malpractice* § 14:2 at 585–86 (2007) (hereinafter *"Legal Malpractice"*); Restatement (Third) of the Law Governing Lawyers § 49 (2000) (tracking this distinction).

■ It follows that an attorney may be liable for malpractice under Arizona law for departing from the standard of care, for breaching the standard of conduct, or both. *See Smith v. Mehaffy*, 30 P.3d 727, 733 (Colo.Ct.App.2000) (distinguishing, in a practical manner, between the dual bases of malpractice liability).

## B. A Prima Facie Case

■ Although held to standards of care and loyalty, lawyers are not guarantors of successful litigation outcomes. *Talbot*, 13 Ariz.App. at 231, 475 P.2d at 521. Malpractice liability attaches only when the breach of the applicable standard of care or conduct is the cause in fact and legal cause of a cognizable injury to the client.

### 1. Cognizable Injury

■ In an action for legal malpractice, "injury" means "the loss of a right, remedy or interest, or the imposition of liability." 3 *Legal Malpractice* § 20:1 at 3. A cause of action for legal malpractice, whether sounding in negligence or fiduciary breach,

will not lie where "mental injury is the sole complaint." *Id.* § 20:11 at 31; *Deno v. Transamerica Title Ins. Co.*, 126 Ariz. 527, 530, 617 P.2d 35, 38 (Ct.App.1980).

■ "Damages," in contrast, concern "the measure of that injury." *Id.* at 3; *Commercial Union Ins. Co. v. Lewis & Roca*, 183 Ariz. 250, 255 n. 4, 902 P.2d 1354, 1359 n. 4 (Ct.App.1995). As discussed in further detail below, economic damages proximately caused by malpractice are recoverable, and mental injury damages may also be awarded pursuant to Arizona law if they are a consequence of the attorney's "willful fiduciary breach." *Reed v. Mitchell & Timbanard, P.C.*, 183 Ariz. 313, 318, 903 P.2d 621, 626 (Ct.App. 1995).

### 2. Attorney Negligence Malpractice

■ The "basic elements" of a prima facie case for attorney negligence are the same "as in any negligence action." *Phillips v. Clancy*, 152 Ariz. 415, 418, 733 P.2d 300, 303 (Ct.App.1986). To make a prima facie case, the plaintiff must establish: "(1) the existence of an attorney-client relationship which imposes a duty on the attorney to exercise that degree of skill, care, and knowledge commonly exercised by members of the profession, (2) breach of that duty, (3) that such negligence was the proximate cause of resulting injury, and (4) the fact and extent of the injury." *Id.* at 418, 733 P.2d at 303.

### 3. Fiduciary Breach Malpractice

■ The Arizona courts have not specifically addressed the elements of a claim of malpractice sounding in fiduciary breach. As a general matter, this cause of action entitles "a protected person (such as a beneficiary of an express trust or a client), commonly referred to as the principal, to recover against a person (such as a trustee or a lawyer), commonly called the

agent, for a violation of the duties of the fiduciary." Charles W. Wolfram, *A Cautionary Tale: Fiduciary Breach as Legal Malpractice,* 34 Hofstra L.Rev. 689, 705 (2005). "That concept has a long history in decisions finding a lawyer liable to a client for fiduciary breach, and it remains the base of all such claims." *Id.*

■ The Arizona Supreme Court would likely conclude, in line with the majority view, that "the essential elements of legal malpractice based on breach of fiduciary duty include the following: (1) an attorney-client relationship; (2) breach of the attorney's fiduciary duty to the client; (3) causation, both actual and proximate; and (4) damages suffered by the client." *Kilpatrick v. Wiley, Rein & Fielding,* 909 P.2d 1283, 1290–93 (Utah Ct.App.1996); *accord* 2 *Legal Malpractice* § 14:2 at 589; Restatement (Third) of the Law Governing Lawyers § 49 cmt. e (2000) ("[T]he rules concerning causation, damages, and defenses that apply to lawyer negligence actions also govern actions for breach of fiduciary duty.").

■ Proof of a cognizable injury is required to state a claim for malpractice, whether sounding in negligence or fiduciary breach. *See Schweizer v. Mulvehill,* 93 F.Supp.2d 376, 395–96 (S.D.N.Y.2000) ("The loss attributable to malpractice must be real and not hypothetical, and the damages must be readily measurable in economic terms.") The client's after-the-fact emotional suffering from a consensual sexual relation with her attorney is not actionable without more. "Intangibles such as shame, humiliation, and emotional distress" do not constitute "injury" for fiduciary breach malpractice, as "[p]ermitting ... intangible injury in the form of emotional distress to replace proof of actual damages would circumvent the statutory limitations on such claims as criminal conversation and alienation of affections." Margit Livingston, *When Libido Subverts*

*Credo: Regulation of Attorney–Client Sexual Relations,* 62 Fordham L.Rev. 5, 28 (1993).

A New York trial court recently applied this rule to deny recovery to a plaintiff-client who entered into a consensual sexual relationship with her attorney without any independently inappropriate conduct on the part of the lawyer, such as coercion. *Guiles v. Simser,* 9 Misc.3d 1083, 804 N.Y.S.2d 904 (Sup.Ct.2005), *aff'd,* 35 A.D.3d 1054, 826 N.Y.S.2d 484 (2006). "Unlike the typical case ... there is no evidence here that defendant misused information disclosed by the client in any manner resulting in a detriment to her legal position or that he bartered his services for sex. Nor is there any proof of damages to the client by reason of erroneous, inadequate or laggardly legal advice or dilatory tactics by the lawyer in dealing with the matter entrusted to him.... In short, plaintiff has shown no injury to her position in relation to her case." *Id.* at 908; *Vallinoto v. DiSandro,* 688 A.2d 830, 835 (1997) (same); *cf. McDaniel v. Gile,* 230 Cal.App.3d 363, 281 Cal.Rptr. 242 (Cal. Ct.App.1991) (attorney's withholding of legal services to gain sexual favors, where the quid pro quo caused client's legal position in divorce action to suffer, was a cognizable injury for purposes of breach of fiduciary duty and constituted outrageous conduct for claim of intentional infliction of emotional distress).

**C. Trial Methodology**

■ The "case-within-a-case" method is the "accepted and traditional means of resolving the issues involved in the underlying proceeding in a legal malpractice action," whether sounding in negligence or breach of fiduciary duty. 4 *Legal Malpractice* § 33:9 at 1046. Under this approach, "the allegedly negligent attorney becomes the proxy for or steps into the

shoes of the original offending defendant." *Arciniega v. Bank of San Bernardino,* 52 Cal.App.4th 213, 230, 60 Cal.Rptr.2d 495, 506 (Ct.App.1997). The *Arciniega* court observed that the "misperforming lawyer is deemed to constitute the same 'target,' legally speaking, as the original offending defendant. Because of the legal malpractice, the original target is out of range; thus, the misperforming attorney must stand in and submit to being the target instead of the former target which the attorney negligently permitted to escape. This is the essence of the case-within-a case doctrine." *Id.* at 230, 60 Cal.Rptr.2d at 506.

"In a jury trial, the court examines the elements of a cause of action for legal malpractice or of an asserted defense to determine what issues the court will decide and what issues will be submitted to the jury." 4 *Legal Malpractice* § 33:12 at 1079. In *Phillips,* the Arizona Court of Appeals considered the issue of the "appropriate arbiter," and concluded that the resolution of "legal issues . . . is reserved for the exclusive province of judges," while "the jury in the malpractice case should decide the disputed factual issues pertaining to the original suit." 152 Ariz. at 421, 733 P.2d at 306; *Molever v. Roush,* 152 Ariz. 367, 374, 732 P.2d 1105, 1112 (Ct.App.1986). The division of responsibility between the judge and the jury is "founded on the premise that the object of the second trial is not to determine what the original judge would actually have done. Rather, the issue in the malpractice case is what the outcome *should* have been if the issue had been properly presented." *Phillips,* 152 Ariz. at 421–22, 733 P.2d at 306–07 (citation and internal quotations omitted) (emphasis in original).

"A jury is fully capable of replicating the judgment of another fact-finding tribunal, whatever its composition." *Id.* at 421–22, 733 P.2d at 306–07 (citation and internal quotations omitted). However, "no matter the factual issue, the . . . rule is that, if the evidence is undisputed or so conclusive that reasonable persons would not disagree, the resolution presents a question of law for the court." 4 *Legal Malpractice* § 33:12 at 1080; *Talbot,* 13 Ariz.App. at 231, 475 P.2d at 521 (same).

## D. Causation

### 1. "But–For" Causation

When the malpractice sounds in negligence, "the plaintiff must prove that but for the attorney's negligence, he would have been successful in the prosecution or defense of the original suit." *Phillips,* 152 Ariz. at 418, 733 P.2d at 303. "Conversely, 'but-for' causation does not exist if the event would have occurred without the lawyer's conduct." 1 *Legal Malpractice* § 8:5 at 984. "Where the attorney's error was an omission, the inquiry is, assuming the attorney performed the act, would the plaintiff have achieved the claimed benefit?" *Id.* at 984.

To prove "but-for" causation, the plaintiff must show that causation by the defendant's act or omission is reasonably likely, not merely possible. This is the holding of *Purcell v. Zimbelman,* 18 Ariz. App. 75, 500 P.2d 335 (1972), a case involving medical rather than legal malpractice. *See Mann v. GTCR Golder Rauner, L.L.C.,* 351 B.R. 685 (D.Ariz.2006) (applying *Purcell* to a claim of legal malpractice). The *Purcell* court held that "[a]n essential element of the plaintiff's cause of action for negligence is that there must be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." 18 Ariz. App. at 82, 500 P.2d at 342. Thus, the plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the

conduct of the defendant was a substantial factor in bringing about the result." *Id.* at 82, 500 P.2d at 342. "Although a mere possibility of such causation is not enough, the plaintiff is not required to prove his case beyond a reasonable doubt and he need not negate entirely the possibility that defendant's conduct was not a cause." *Id.* at 82, 500 P.2d at 342. "All that is required in negligence cases is for the plaintiff to present probable facts from which negligence and causal relations may reasonably be inferred." *Id.* at 82, 500 P.2d at 342; *Thompson v. Sun City Cmty. Hosp.*, 141 Ariz. 597, 606, 688 P.2d 605, 614 (1984) ("[p]laintiff fails in his burden of proof and a verdict is directed if the evidence does not warrant a finding that the chance of recovery ... absent defendant's negligence, was over 50%"); *Salt River Valley Water Users' Ass'n v. Blake*, 53 Ariz. 498, 503–04, 90 P.2d 1004, 1007 (1939) ("juries may not return verdicts on surmise or speculation" as to the cause-in-fact of the injury).

The meaning of "but-for" causation in the context of legal malpractice is addressed in *Hyatt Regency Phoenix Hotel Co. v. Winston*, 184 Ariz. 120, 137, 907 P.2d 506, 523 (Ct.App.1995), an action for attorney negligence. The court endorsed a jury instruction that "[m]alpractice causes economic loss if it helps to produce the loss and the economic loss *would not have happened without the malpractice*," observing that the "emphasized language has the same meaning as the 'but for' formulation, and it is the preferred instruction in negligence cases." *Id.* at 137, 907 P.2d at 523 (emphasis in original).

■ The case-within-a-case methodology requires the appropriate arbiter to determine what the result *"should* have been," not what it "could have been." *Phillips*, 152 Ariz. at 421, 733 P.2d at 306 (emphasis in original). Determining what "could have" or "might have" been decided

in the underlying action is speculative and is not the objective of an action for legal malpractice. 4 *Legal Malpractice* § 33:8 at 1044. "Those allegations are not sufficient for sustaining causation in a complaint." *Id.* at 1044. "Where proof of causation would be left to the jury's speculation, a directed verdict is properly entered." *Tennen v. Lane*, 149 Ariz. 94, 97, 716 P.2d 1031, 1034 (1986).

### 2. Proximate Causation and Foreseeability of the Injury

■ The malpractice plaintiff must also show that the attorney's departure from the standard of care was the legal or proximate cause of her injury. *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 32, 945 P.2d 317, 345 (Ct.App. 1996); *Rogers v. Retrum*, 170 Ariz. 399, 401, 825 P.2d 20 (Ct.App.1991) (distinguishing between cause in fact and legal cause); *Phillips*, 152 Ariz. at 418, 733 P.2d at 303 (requiring both "but-for" and "proximate" causation); *see Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 133 F.Supp.2d 747, 758 (D.Md.2001) (distinguishing between cause in fact and legal cause in attorney-negligence malpractice).

■ In *McDowell v. Davis*, 104 Ariz. 69, 71, 448 P.2d 869, 871 (1968), a case involving the negligent operation of an automobile, the court observed that "proximate cause" has been unvaryingly defined in this State as follows:

> The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred.

*Id.* at 71, 448 P.2d at 871. This definition of proximate causation subsumes the separate requirement of cause in fact. "A prerequisite to any determination of proximate cause is a showing of cause in fact;

the defendant's wrongful conduct must be a cause in fact of the plaintiff's injury before there can be liability." Jefferson L. Lankford & Douglas A. Blaze, 1–4 *The Law of Negligence in Arizona* § 4.02 (3d ed.2005) (citation and internal quotations omitted) (hereinafter *"Negligence in Arizona"*).

 In *Robertson v. Sixpence Inns of America, Inc.,* 163 Ariz. 539, 789 P.2d 1040 (1990), a failure-to-warn case, the court explained that proximate cause focuses on the foreseeability of the injury, not the degree of culpability of the defendant or the amount of harm caused by his particular act or omission. "The defendant's act or omission need not be a 'large' or 'abundant' cause of the injury," the court explained. *Id.* at 546, 789 P.2d at 1047. "[E]ven if the defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for the conduct." *Id.* at 546, 789 P.2d at 1047 (citations and internal quotations omitted). The concept was illustrated with a discussion of intervening causes. Under Arizona's formulation of "proximate cause," an "efficient intervening cause" can absolve a tortfeasor from liability even if he was the cause in fact of the injury. *McDowell,* 104 Ariz. at 71, 448 P.2d at 871 "An intervening cause is an independent cause that intervenes between defendant's original negligent act or omission and the final result and is necessary in bringing about that result." *Robertson,* 163 Ariz. at 545, 789 P.2d at 1047. "Not all intervening acts are superseding causes," cautioned the court. *Id.* at 545, 789 P.2d at 1047. "A superseding cause sufficient to become the proximate cause of the final result and relieve defendant of liability for his original negligence, arises only when an intervening force was unforeseeable and may be described, with the benefit of hindsight, as extraordinary." *Id.* at 545, 789 P.2d at 1047. It would be unfair to hold a defen-

dant liable under such "extraordinary" circumstances. *Rossell v. Volkswagen of Am.,* 147 Ariz. 160, 164, 709 P.2d 517, 521 (1985); *Gipson v. Kasey,* 496 Ariz. Adv. Rep. 41, 214 Ariz. 141, 150 P.3d 228 (2007); *Thompson v. Better–Bilt Aluminum Prods. Co.,* 171 Ariz. 550, 554, 832 P.2d 203, 207 (1992); 1–4 *Negligence in Arizona* § 4.02.

 "In order to hold an actor liable for negligence, a plaintiff must prove that the plaintiff was in the foreseeable range of the negligent conduct, and that one of the dangers or risks that made the actor's conduct negligent brought about the injury." *Barrett v. Harris,* 207 Ariz. 374, 382, 86 P.3d 954, 962 (Ct.App.2004). Determining whether a defendant's conduct was a but-for cause of the plaintiff's injury is logically distinct from, and a condition precedent to, analysis of whether plaintiff was "within the foreseeable range" of her lawyer's negligent conduct. *Id.* at 382, 86 P.3d at 962. "Negligence," the *Barrett* court emphasized, "is not actionable in the abstract." Although a "tortfeasor can be liable if its conduct contributed 'only a little' to the plaintiff's damages," the plaintiff must prove that the defendant's act or omission is *both* a but-for cause and a legal cause of the complained-of injury before she may recover. *Id.* at 382, 86 P.3d at 962.

### 3. But–For Causation and Proximate Causation in Litigation Malpractice

### i. Subversion of the But–For Causation Requirement

 Cecala attempts to elide her burden of proof regarding cause in fact. In a summary judgment posture, the record evidence must allow a fair-minded juror to reasonably infer that, but for Newman's negligence, Cecala *should* have prevailed in the NASD arbitration. *Purcell,* 18 Ariz.

App. at 82, 500 P.2d at 342. Cecala contends, in contrast, that "cause-in-fact" exits if Newman's act or omission contributed "only a little" to the plaintiff's injuries. (Doc. ## 193 at 13–14; 230 at 1; 236 at 2.) This fundamentally misstates the law. The "only a little" language upon which Cecala so heavily relies has no bearing on the cause-in-fact inquiry. The quoted language means only that, *upon proof of but-for and legal causation,* a defendant may be liable for the foreseeable results of his actions even if he was not the *only* or even the *predominant* cause of that injury.

This confusion permeates Cecala's theory of her case, and the error is fatal to her. By this confusion, she would absolve herself of the burden of showing how any reasonable trier of fact *should* have found for her in the arbitration, but for Newman's negligent acts. Instead, she would empower a malpractice jury to find against her former attorney merely if his negligence contributed "only a little" to the arbitration loss that would have been lost anyway. This would abolish the "but-for" causation requirement.

ii. **The Judgment Error Rule, Speculativeness, and Lack of Foreseeability**

 The foreseeability requirement of proximate causation is also pertinent and fatal to Cecala's case. Proximate causation is addressed only after the plaintiff establishes that she should have prevailed but for the defendant-attorney's malpractice. 1–4 *Negligence in Arizona* § 4.02. After crossing the but-for threshold, Cecala is required to show, by a preponderance of the evidence, that the litigation injury was foreseeable in the sense that the attorney-defendant should have anticipated the harm from the negligent act or omission. 1 *Legal Malpractice* § 8:5 at 984–85; *see TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.,* 444 F.3d 587, 592 (7th Cir. 2006) (holding that a law firm's failure to produce documents in discovery was not the legal cause of the ensuing $1.2 million in attorney fees for discovery and sanctions).

 Under the judgment error rule, malpractice liability will not attach for tactical decisions made in good faith in the course of preparing or trying a case. Injury flowing from such errors in attorney judgment is not foreseeable as a matter of law. "Good faith," explain leading commentators, "is based on an objective standard of whether the lawyer's decisions were intended to benefit the client in the representation." 4 *Legal Malpractice* § 30:8 Mallen and Smith explain the concept as follows:

Some alleged errors that should not be the basis for legal malpractice consideration involve inherently judgmental decisions. Thus, considerations, such as *the choice of the trier of fact, selection of venue, the style of presentation,* should not support a legal malpractice claim. Although lawyers do make tactical decisions, a fundamental policy is that the result should not vary for such reasons. The standard for the case-within-a-case methodology is determining what the result "should have been," not what it "could have been...."

In hind sight, even the defendant-attorney probably would agree with the unhappy client that a different approach might have been more productive. Thus, the rule than attorney is not liable for a mere error in judgment is extremely appropriate and necessary to protect the attorney engaged in the conduct of a trial, who must continuously select between alternatives, none of which are necessarily wrong or right.

4 *Legal Malpractice* §§ 30:6 at 401; 30:40 at 601 (emphasis added).

The rule of no liability for good faith litigation judgments can be viewed as a lack of proof of proximate causation or

lack of proof of "but-for" causation. The speculativeness is fatal under either category. *See Estate of Re v. Kornstein, Veisz & Wexler,* 958 F.Supp. 907, 921, 924 (S.D.N.Y.1997) (Plaintiffs failed to show that there should have been a different result in arbitration if the attorneys adopted the strategies urged by them. "There is no evidence from which a trier of fact could infer that the same argument ... would have been dispositive if delivered with a different gloss and with greater zeal.... In short, plaintiffs' hindsight determination that defendants were not rigorous enough or quick enough in advancing the disputed position is precisely the sort of second-guessing of counsel's strategic judgment that does not rise to the level of legal malpractice.") (citations and internal quotations omitted).

#### 4. Fiduciary Breach Malpractice

■ The same standards of actual and legal causation that govern an action for attorney negligence apply with equal force in an action for fiduciary breach, which is also tried under the "case-within-a-case" methodology. *Kilpatrick,* 909 P.2d at 1290–93; *Weil Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.,* 10 A.D.3d 267, 271, 780 N.Y.S.2d 593, 596 (N.Y.App.Div.2004) ("We have never differentiated between the standard of causation [required] for a claim of legal malpractice and one for breach of fiduciary duty in the context of attorney liability. The claims are coextensive."); *cf. Milbank, Tweed, Hadley & McCloy v. Chan Cher Boon,* 13 F.3d 537, 543 (2d Cir.1994) (relaxing the but-for causation standard for fiduciary breach under a now discredited interpretation of New York law); *see 4 Legal Malpractice* § 33:10 at 1073–74.

### IV. Cecala's Second Amended Complaint

Cecala's Second Amended Complaint asserts four bases of attorney and law firm liability: 1) legal malpractice, 2) breach of fiduciary duty, 3) intentional infliction of emotional distress, and 4) negligent supervision. (Doc. # 67.)

The first count challenges two discrete patterns of illicit conduct: 1) the mishandling of Cecala's Title VII claims against NationsBank both prior to and during the NASD arbitration; and 2) the sexualization of the attorney-client relationship, which in Cecala's view "impaired Newman's judgment" and precluded dispassionate, objective representation. (*Id.* at 25.) Cecala avers that these patterns of tortious conduct converged to "cause[ ] or contribute[ ] to the loss of Cecala's underlying employment claims," leading to the forfeiture of money and equitable damages against NationsBank, the loss of "salary and benefits commensurate with her abilities and qualifications," and injury to her reputation. (*Id.* at 26.) Though somewhat inartfully plead, Cecala's claim for "malpractice" sounds in negligence because it targets Newman's multiple departures from the standard of care, and further alleges that these patterns of misconduct proximately caused Cecala to suffer pecuniary damages. (PSOF 14, 17.)

Count two, in contrast, asserts malpractice liability on a theory of fiduciary breach. Cecala submits that her former lawyer breached his duties of "loyalty, confidentiality, and disclosure" by "becoming sexually involved" with Cecala and "failing to terminate the representation in a responsible manner." (Doc. # 67 at 28.) The gravamen of this claim is that Newman willfully abused the relationship of trust and confidence that exists between an attorney and his client by engaging in a pattern of "self-serving, manipulative and predatory" sexual conduct with Cecala without her effective consent. (Doc. # 193 at 8; PSOF 5–6.)

Cecala avers that Newman's willful violation of his fiduciary duties negatively impacted the quality of her legal representation, causing *both* economic and psychological injury. "In addition to the pecuniary damages" that she suffered "as a result of the loss of her monetary claims and equitable remedies against NationsBank, [D]efendant Newman's conduct in sexualizing the attorney-client relationship caused further emotional, psychological, and physical damage to [P]laintiff." (Doc. # 67 at 32.)

Cecala's causes of action for attorney negligence and breach of fiduciary duty complain, in part, of the same fundamental litigation injury: the loss of her otherwise meritorious claims against NationsBank. However, Cecala's claim for breach of fiduciary duty seeks relief for psychological injury in addition to litigation injury.

## V. Negligent Supervision

■■■■ Cecala's fourth theory of recovery, which targets Newman's law firm, need not detain the court for long. Cecala avers in her Second Amended Complaint that Cooperman Levitt "breached its duty of supervision" as well as "applicable attorney ethical rules to exercise reasonable care in supervising Newman." (Doc. # 67 at 35.) Cecala alleges that she suffered pecuniary and psychological damages as a direct result of Cooperman Levitt's failure "to supervise [Newman] adequately." (*Id.*) This claim is plagued by numerous deficiencies.

■■■■ First, Cecala has failed to offer any evidence as to the standard of care from which the firm is alleged to have deviated. While a professional corporation may be liable under New York law for the torts of its employees under a theory of respondeat superior, *Connell v. Hayden,* 83 A.D.2d 30, 443 N.Y.S.2d 383 (1981), Cecala has cited no authority in support of the proposition that Cooperman Levitt

owed her an affirmative duty of supervision on the facts of this case, nor has she provided any insight as to what that duty might command.

■■■■ State ethics rules do not, of course, create private rights of action for aggrieved clients. "With few exceptions, the courts agree that the violation of an ethics rule alone does not create a cause of action, constitute legal malpractice *per se* or necessarily create a duty." 2 *Legal Malpractice* § 19:7 at 1208. The Arizona Supreme Court expressly aligned itself with this majority view when it "declined to use the court's own ethical standards as a basis upon which to impose legal malpractice liability." *Stanley v. McCarver,* 208 Ariz. 219, 225 n. 6 92 P.3d 849, 855 n. 6 (2004) (citing Ariz. R. Sup.Ct. 42, R. Prof. Resp., Preamble, Scope ¶ 20 (noting that rules of professional responsibility "are not designed to be a basis for civil liability")); *Elliott v. Videan,* 164 Ariz. 113, 116, 791 P.2d 639, 642 (Ct.App.1989) (discussing jury instructions).

Cecala attempts to support her theory of negligent supervision with the affidavit of her legal ethics expert, Professor Geoffrey C. Hazard, Jr. (PSOF Ex. 11.) Professor Hazard opines that Cooperman Levitt failed to supervise Newman or take remedial action against Newman in violation of a legal duty. But his opinion is wholly speculative. First, Professor Hazard assumes that Cooperman Levitt's failure to adhere to a New York Disciplinary Rule is actionable negligence. (*Id.* Ex. 11 at 7.) *Stanley* is directly to the contrary. Second, taking "the facts alleged by [Cecala] concerning sexual relations between her and [Newman] ... as true" Professor Hazard simply "assumes" that "one or more of" Newman's law partners knew or reasonably should have known of the sexual relationship between Newman and Cecala. (*Id.* Ex. 11 at 2, 7.) There is no factual or

evidentiary foundation for this assumption. (*Id.* Ex. 11 at 2.)

Finally, even assuming that Cooperman Levitt did owe some "duty of supervision" to its client, Cecala has failed to adduce any evidence tending to show that, but for the breach of that legal duty, the firm would have detected and would have stopped the inappropriate relationship between Newman and his client. Professor Hazard cannot manufacture a genuine issue of fact by assuming facts without evidence and liability without law. (*Id.* Ex. 11 at 8.)

Summary judgment will be granted against Cecala's claim for negligent supervision for failure "to establish the existence of an element essential to [her] case, and on which [Cecala] will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## VI. Statute of Limitations

■■■ Section 12–542, Arizona Revised Statutes, prescribes a two-year limitations period "for injuries done to the person of another including causes of action for ... malpractice." "The determination of when a cause of action accrues on a claim for legal malpractice is governed by the discovery rule." *Commercial Union,* 183 Ariz. at 254, 902 P.2d at 1358. Under that rule, the statute of limitations does not begin to run until a plaintiff has actual or constructive knowledge that she has suffered an "actionable wrong," defined as a "tort that results in appreciable non-speculative harm." *Manterola v. Farmers Ins. Exch.,* 200 Ariz. 572, 576, 30 P.3d 639, 643 (Ct.App.2001) (citations and internal quotations omitted). "Commencement of the statute of limitations will not be put off until one learns the full extent of his damages. Rather, the statute commences to run when the plaintiff incurs some injury or damaging effect from the

malpractice." *Commercial Union,* 183 Ariz. at 255, 902 P.2d at 1359.

The parties agree that Cecala's three remaining theories of recovery are subject to this two-year limitations period. (Doc. # 171 at 9.) Newman urges the court to dismiss "all claims, however denominated," for failure to comply with A.R.S. § 12–542. (*Id.* at 7.) However, Cecala's litigation malpractice claims were timely filed pursuant to an exception to that limitations period. The claims for intentional infliction of emotional distress and for psychological injury from breach of fiduciary duty are entitled to no such exception, and therefore are out-of-time.

## A. The *Amfac* Cases: Errors in Litigation

■■■ In the litigation context, "the injury or damaging effect on the unsuccessful party [in an action for litigation legal malpractice] is not ascertainable until the appellate process is completed or is waived by failure to appeal." *Amfac Distrib. Corp. v. Miller,* 138 Ariz. 152, 153–54, 673 P.2d 792, 794 (1983) (*"Amfac I"*); *Amfac Distrib. Corp. v. Miller,* 138 Ariz. 155, 157, 673 P.2d 795, 797 (Ct.App.1983) (*"Amfac II"*) ("it is only when the litigation is terminated and the client's rights are 'fixed' that it can safely be said that the lawyer's misdeeds resulted in injury to the client"). Because "apparent damage may vanish with successful prosecution of an appeal and ultimate vindication of the attorney's conduct by an appellate court," and in order to "preserve the essential element of trust in the attorney-client relationship," a cause of action for malpractice in the litigation context does not accrue until judicial review is exhausted or waived. *Amfac II,* 138 Ariz. at 156, 159, 673 P.2d at 796, 799; *see Glaze v. Larsen,* 207 Ariz. 26, 83 P.3d 26 (2004) (articulating

the practical and policy rationales for the "errors-in-litigation" rule of accrual).

■ In its October 11, 2005 Order, the court held *Amfac I* and its progeny applicable to malpractice in arbitration, stating that "accrual of a legal malpractice claim arising in arbitration begins when the judicial review of the arbitration award is concluded and the appellate process is completed or is waived by a failure to appeal." (Doc. # 65 at 9.) Although Newman's allegedly negligent representation was complete on or around June 21, 1999, the date he was formally discharged by Cecala, the statute of limitations did not begin to run as to his departures from the standard of care until November 21, 2002, when Cecala abandoned further judicial review of the adverse arbitral award. (*Id.* at 2.) Thus, Cecala's count of attorney negligence was timely filed on November 21, 2004.

■ Cecala's fiduciary breach claim, having been filed in November 2004, is untimely under A.R.S. § 12–542 unless it is sheltered by the *Amfac* cases or some other exception to the two-year limitations period. Though it is a novel question, the court also finds that, to the extent it claims injury to her case against NationsBank, Cecala's claim for fiduciary breach was timely filed under *Amfac I* and its progeny. As explained in the court's prior Order, the *Amfac* cases delay the accrual of a cause of action for malpractice when the tangible injury upon which that claim is founded could "vanish with successful prosecution of an appeal." *Amfac II*, 138 Ariz. at 156, 159, 673 P.2d at 796, 799. The litigation-injury component of Cecala's claim for fiduciary breach is predicated upon the adverse decision of the arbitral tribunal. Setting aside that award would likely have cured that injury.

## B. *Amfac* Does Not Apply to Non–Litigation Injury

■ Cecala alleges that Newman's "outrageous" sexual conduct began on August 1998, and continued until June 1999. (Doc. # 193 at 9.) Assaying the facts in the light most favorable to her, Cecala's claim for intentional infliction of emotional distress accrued, at the latest, on June 21, 1999, when she discharged her lawyer and ended their sexual relationship. *See Floyd v. Donahue*, 186 Ariz. 409, 413, 923 P.2d 875, 879 (Ct.App.1996) (discussing the doctrine of "continuing torts"). Therefore, absent an exception to A.R.S. § 12–542, Cecala's claim for intentional infliction of emotional distress was out-of-time by three years and five months when filed on November 21, 2004.

Cecala first contends that her intentional tort claim should be sheltered under *Amfac I* and its progeny because "Mr. Newman's outrageous conduct cannot be separated from its adverse consequences that constitute malpractice." (Doc. # 193 at 9.) Cecala has marshaled no authority for the proposition that the special rule for "errors in litigation" has any application to any tort where the injury is fixed when the tort is committed. No policy interest would be furthered by permitting a plaintiff to sleep on her rights when her attorney causes injury to her personhood rather than to her right to competent representation. Mindful of this, the reported decisions make clear that *Amfac I* and its progeny do not apply where, as here, the injury occurs contemporaneously with the malpractice, but the injury cannot be corrected by the successful prosecution of an appeal. *Commercial Union*, 183 Ariz. at 256, 902 P.2d at 1360 (citation omitted). Because it did not "arise in arbitration" within the meaning of the court's prior Order, Cecala's claim for intentional inflic-

tion of emotional distress accrued no later than June 21, 1999. (Doc. # 65 at 9.)

 Cecala's fiduciary breach damages that stand free of her litigation injury, such as emotional suffering from Newman's "predatory," quid pro quo sexualization of the attorney-client relationship, also were fixed on June 21, 1999, the date she discharged Newman. Therefore, the accrual of that injury was on June 21, 1999, and was not delayed by *Amfac I* and its progeny.

## C. "Unsound Mind" Tolling Does Not Apply

 Cecala submits that her nonlitigation claims are tolled by A.R.S. § 12–502, which provides, "If a person entitled to bring an action ... is at the time the cause of action accrues ... of unsound mind, the period of such disability shall not be deemed a portion of the period limited for commencement of the action." "The statutory provision for tolling is premised on equitable principles similar to those that underlie the discovery rule: it is unfair to bar an action in which the plaintiff is mentally disabled and thus unable to appreciate *or* pursue his or her legal rights." *Doe v. Roe,* 191 Ariz. 313, 325, 955 P.2d 951, 963 (1998) (emphasis in original). A litigant need not be institutionalized nor be adjudged legally incompetent to qualify for tolling under A.R.S. § 12–502. *Kiley v. Jennings, Strouss & Salmon,* 187 Ariz. 136, 141, 927 P.2d 796, 801 (Ct.App.1996).

Cecala concedes that her claim for intentional infliction of emotional distress accrued on June 21, 1999, at the latest, five years and five months before filing this action. (Doc. # 193 at 11.)

### 1. The Meaning of "Unsound Mind"

 Section 12–502, Arizona Revised Statutes, does not supply a definition for the term "unsound mind," so the courts

have filled the gap. The leading cases are *Doe* and *Florez v. Sargeant,* 185 Ariz. 521, 917 P.2d 250 (1996). A person is of unsound mind when he is "unable to manage his daily affairs or to understand his legal rights or liabilities." *Doe,* 191 Ariz. at 326, 955 P.2d at 964 (citation and internal quotations omitted). The definition is disjunctive: "Facts permitting ... Cecala is entitled to have the jury consider both alternatives." *Id.* at 328, 955 P.2d at 966.

The plaintiffs in *Florez* and *Doe* alleged that they had suffered sexual abuse during childhood and adolescence and, as a result of the enduring psychological ramifications of those injuries, remained fundamentally unaware of their right to sue, both at and after the time their claims accrued. *Florez,* 185 Ariz. at 521, 917 P.2d at 250; *Doe,* 191 Ariz. at 330, 955 P.2d at 968. The *Doe* court explained, "One who recalls ... repressed memories may not be able to connect the images in a fashion sufficiently coherent to allow an understanding of the incident or the resulting injury. Such a person may not be able to articulate events so as to pursue her rights." *Id.* at 320, 955 P.2d at 958.

 However, in light of the countervailing policies implicated by the suspension of the limitations period, the Arizona Supreme Court held in *Florez,* as in *Doe,* that to defeat summary judgment a plaintiff must muster "hard evidence" to create a genuine issue of material fact as to her inability to appreciate or pursue her legal rights. In most cases, "the best guide to whether somebody can understand and pursue his legal rights is how that person behaves, not what that person says he or she cannot do." *Doe,* 191 Ariz. at 332, 955 P.2d at 970 (Martone, J., concurring).

### 2. Quantum of Evidence to Defeat Summary Judgment

 "In the context of determining unsound mind as evidenced by an inability

to manage daily affairs, the question [on a defense motion for summary judgment] is whether there is *credible evidence* of the plaintiff's *inability* to manage daily affairs." *Doe,* 191 Ariz. at 327, 955 P.2d at 965 (emphasis in original). "The plaintiff is not required to discredit all evidence of ability to manage her affairs-such controverting evidence merely establishes that there is a jury question on an issue of material fact." *Id.* at 328, 955 P.2d at 965. "It is not [for the trial court] to weigh conflicting evidence to determine whether the plaintiff was capable of functioning on a day-to-day basis. That role would encroach upon the jury's function." *Id.* at 328, 955 P.2d at 965. The same is true for the second prong of the test for unsound mind, where the burden is on the plaintiff to create a genuine issue of material fact as to her inability to understand and assert legal rights. *Id.* at 329, 955 P.2d at 967.

 "If there is hard evidence that a person is simply incapable of carrying on the day-to-day affairs of human existence, then the statute is tolled. Otherwise it is not. These are empirical facts easily verifiable and ... difficult to fabricate." *Florez,* 185 Ariz. at 521, 917 P.2d at 255. "The purpose of the statute of limitations is to protect defendants and courts from stale [and fraudulent] claims where plaintiffs have slept on their rights." *Doe,* 191 Ariz. at 322, 955 P.2d at 960 (citation and internal quotations omitted). This "policy cannot be overcome by conclusory averments such as assertions that one was unable to manage daily affairs or understand legal rights and liabilities. The plaintiff instead must set forth specific facts—hard evidence—supporting the conclusion of unsound mind." *Id.* at 326, 955 P.2d at 964; *Florez,* 185 Ariz. at 526, 917 P.2d at 255. These statements from the Arizona Supreme Court, though couched in terms of Arizona procedure, apply with equal force in the context of a Fed.R.Civ.P. 56(c) motion. *Thornhill Publ'g Co., Inc. v.*

*GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979) (conclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment).

*Florez* and *Doe* illustrate what is insufficient and what is sufficient to defeat summary judgment on the issue of unsound mind, respectively. The plaintiffs in *Florez* were an adult male and an adult female who accused a priest and a male parent of sexually molesting them during childhood. They were capable of maintaining employment, taking care of financial affairs, attending school part-time, and working full-time. *Florez,* 185 Ariz. at 526, 917 P.2d at 255. Their experts opined that the plaintiffs suffered disabling psychological disorders, depression, and post-traumatic stress disorder. These diagnoses provided the sole bases for the experts' "unsound mind" conclusions.

The court held the experts' opinions insufficient to survive summary judgment. In one case, the expert opined that a plaintiff was of "unsound mind" because he "suffered from depression and stress," among other emotional maladies. *Id.* at 527, 917 P.2d at 256. The court said, "If these facts, and others listed in [plaintiff's expert's] affidavit, were sufficient to support a legal finding of 'unsound mind,' then all those who have less than satisfactory lives would be of 'unsound mind.' " *Id.* at 527, 917 P.2d at 256. Although the affidavits "may [have] created a scintilla of doubt," they were insufficient to create a triable issue of material fact in light of the uncontradicted evidence of the plaintiffs' ability to manage their day-to-day affairs. *Id.* at 527, 917 P.2d at 256. The motion for summary judgment was granted because of the absence of facts—hard evidence—to support their claim.

In *Doe,* the plaintiff accused her father of sexually abusing her during her child-

hood. Summary judgment was denied because the plaintiff provided factual substantiation of her disability for the entirety of the period of unsound mind. The experts averred that recollection of the plaintiff's sexual abuse rendered her incapable of performing her duties at a brokerage firm. She was unable to seek employment after voluntarily resigning from her job, she had suicidal ideation, was in denial of the abuse she suffered, and required both psychological and psychiatric therapy and treatment, as well as institutionalization for her mental condition. *Id.* at 327, 955 P.2d at 965.

As to the second prong of the disability standard, plaintiff adduced evidence that she repressed her memories of abuse, was in denial that any abuse took place, was unable to accept that the events had occurred, was unable to articulate them, experienced feelings of complicity with her abuser, and experienced feelings of responsibility and guilt for the abuse. *Id.* at 329, 955 P.2d at 967. The expert affidavits, being grounded in facts, were "more than sufficient to raise a genuine issue of material fact on whether [the plaintiff] was unable to carry on the day-to-day affairs of life." *Id.* at 328, 955 P.2d at 966.

"[T]here [were] facts in the record that detract[ed] from [the plaintiff's] claim of inability to manage daily affairs," however. *Id.* at 328, 955 P.2d at 966. Although "those findings would preclude summary judgment in favor of [p]laintiff if she moved for summary judgment on the unsound mind issue," they did not require the opposite conclusion. *Id.* at 328, 955 P.2d at 966.

### 3. Insufficient Evidence of Inability to Understand Legal Rights

 Cecala has repeatedly and conclusively demonstrated not only that she was *aware* of her intentional tort claim as of June 21, 1999, the date she discharged

lawyer Newman, but also that she was able to "articulate events so as to *pursue* her rights," both as to the arbitration with NationsBank and as to her claims against Newman, from the date of accrual to the present day. *Doe,* 191 Ariz. at 320, 955 P.2d at 958 (emphasis added). In her February 27, 2007 Declaration, submitted in connection with her Motion to Disqualify Newman's' standard of care expert (Doc. # 182 Ex. B), Cecala describes—and documents—her multiple attempts during the claimed period of "unsound mind" to retain counsel for (1) the NASD arbitration, (2) the motion to vacate the adverse award, (3) the appeal of the denial of that motion, and (4) her malpractice claims against Newman.

On July 21, 1999, just one month after her intentional infliction of emotional distress and fiduciary breach claims accrued, Cecala used the Martindale–Hubbell lawyer locator service to search for North Carolina counsel in the area of employment law. (*Id.* Ex. B. Attach. 3.) Having selected the North Carolina law firm of Ferguson Stein, Cecala telephoned John W. Gresham, a member of that firm, to discuss her claims against NationsBank. (*Id.* Ex. B. at 2.) Cecala discloses that "the general topic of my conversation was [Ferguson Stein's] taking over my representation in the NationsBank arbitration." (*Id.* Ex. B at 2.) She further avers that "[w]e talked about my case, my claims, and my need of representation. After hearing about the case, and its procedural status, the firm declined to take over the case." (*Id.* Ex. B. at 2.) Cecala's recollection of subsequent conversations with Ferguson Stein attorneys demonstrates a similar, if not greater, ability to articulate and pursue her legal rights throughout the claimed period of unsound mind. The declarations from Cecala's friends and family, discussed in further detail below, also illustrate Cecala's ability to perform indepen-

dent legal research on her employment and malpractice claims. (PSOF Ex. 23 at 6; Ex. 25 at 3–4.) Cecala's ability not only to recognize but also to assert her legal rights during the claimed period of disability is further illustrated by the arbitration transcript from the two sessions in October 1999 where, having failed to retain new trial counsel, she prosecuted her claims on her own. (*Id.* Ex. 28; Doc. # 246.)

 Nevertheless, Cecala asserts that "she did not have the mental, emotional, or physical ability to assert her legal rights, including bringing this action in a timely manner." (PSOF 25.) This bare conclusion cannot stand in light of Cecala's own detailed admission of her ability to both understand and pursue her legal rights. Whether Cecala was ultimately successful in persuading the arbitrators to rule in her favor, in overturning the adverse award in the federal courts, or in bringing suit against Newman in the Maricopa Superior Court, is irrelevant. The focus of the unsound mind inquiry is on cognition, not competency. *Doe,* 191 Ariz. at 332, 955 P.2d at 970 (Martone, J., concurring).

Unlike the plaintiff in *Doe,* Cecala has not adduced evidence to create a genuine issue of material fact as to her inability to understand her legal rights against NationsBank or lawyer Newman. She has submitted no hard evidence of denial or inability to articulate the wrongs perpetrated by Newman, feelings of complicity with her abuser, or feelings of guilt for the abuse that would show that she did not understand that a wrong had occurred. *Id.* at 329, 955 P.2d at 967. Quite the opposite. The uncontroverted evidence adduced by Cecala demonstrates not only recognition of her legal rights, but the pursuit of those rights throughout the claimed period of disability.

### 4. Insufficient Evidence of Inability to Manage Daily Affairs

Cecala's relationship with Newman caused her profound physical and psychological suffering. The declarations of her family and friends, in particular, present a picture of her emotional instability and mental anguish. The declaration of Cecala's father, Don Cecala, is illustrative:

> For over two years, the roller coaster of emotions and healing appeared to be headed nowhere. One minute there were flashbacks to the healthy, happy daughter we once had, followed by anxiety episodes, or emptiness, or lifelessness, somewhere in between. I endeavored to use the financial dependency as a tool to help with repair. I experimented frequently with the assignment of responsibility in financial detail, such as bill preparation and paying. It sometimes worked but usually didn't. The inconsistency of Renee's personality and capability defied belief. She would be brilliant one minute, and anxiety stricken the next. . . . Tasks could be accomplished individually and they would appear to reflect the total pattern, but they did not.

(PSOF Ex. 23 at 11–12.) That Cecala often needed assistance from her friends and family is insufficient to support a claim of unsound mind where, as here, the uncontroverted evidence shows that Cecala was not only able to care for herself at least *some* of the time, but that she also had the higher degree of mental ability required to research and pursue her legal rights in the underlying case against NationsBank and against attorney Newman for the entirety of the claimed period of functional disability. Cecala has failed to carry her burden to create a triable issue of material fact as to whether she was "simply incapable of carrying on the day-to-day affairs of human existence" from June 21,

1999, through at least November 21, 2002. *Florez,* 185 Ariz. at 526, 917 P.2d at 255.

### i. Expert Affidavits

The court will examine the opinions of the experts who, in Cecala's view, tell "the real story" of her legal disability. (Doc. # 193 at 10 n. 5.)

### a. Dr. Rutter

The first such expert is Dr. Peter Rutter, M.D., a psychiatrist who specializes in the study of "sexual exploitation by attorneys . . . holding a position of trust to act in the best interests of those they were serving." (PSOF Ex. 9 at 3.) Although he interviewed Cecala to familiarize himself with the facts of this case, Dr. Rutter is not Cecala's treating psychiatrist, and his opinion is therefore limited to the record now before the court. (*Id.* Ex. 9 at 2.) In his affidavit and deposition testimony, Dr. Rutter describes a phenomenon known as "transference," whereby the receiver of professional services, such as Cecala, has an expectation of being able to trust the provider of those services, Defendant Newman in this case, to act in her best interests. (*Id.* Ex. 9 at 4; Ex. 10 at 12.)

"Under such conditions, the receiver of services is known and expected to have certain psychological dependency needs and foreseeable vulnerabilities . . . that restrict independent and informed judgment regarding both the professional and personal behavior of the professional." (*Id.* Ex. 9 at 4.) When that relationship of trust is exploited, as Cecala alleges here, "there is a deeper and more pervasive level of injury that sets up in the injured individual a condition in which they now often fear, rather than trust, the very professional they must rely on to help them with their vulnerability." (*Id.* Ex. 9 at 4.) This is the foundation for Dr. Rutter's opinion that Cecala suffered "long-lasting and severe" damages from the sexualization of the attorney-client relationship, to which she did

not effectively consent. (*Id.* Ex. 9 at 5.) He opined further that "[d]epression and post-traumatic injuries" inured, "resulting in extremes both in terms of emotional suffering and loss of previous functional capacity in work, socialization and personal relationships." (*Id.* Ex. 9 at 5.)

Dr. Rutter's opinion does not create a triable issue as to whether Cecala was "incapable of carrying on the day-to-day affairs of human existence" from June 21, 1998, through at least November 21, 2002. *Doe,* 191 Ariz. at 328, 955 P.2d at 964. He asserts bare medical conclusions without support in the "specific facts" or pertinent time periods. *Florez,* 185 Ariz. at 526, 917 P.2d at 255. His opinion as to Cecala's "long-lasting and severe" psychological injury is totally devoid of supporting "hard evidence," and therefore does not satisfy the threshold standard articulated in both *Florez* and *Doe. Id.,* 185 Ariz. at 521, 917 P.2d at 255.

Furthermore, *Florez* expressly held that a diagnosis of post-traumatic stress disorder is not sufficient to toll under A.R.S. § 12–502. 185 Ariz. at 526, 917 P.2d at 255. Dr. Rutter's affidavit and deposition testimony do not, whether standing alone or taken together with the balance of Cecala's evidence, create a triable issue of material fact as to Cecala's inability to manage the day-to-day affairs of human existence.

### b. Dr. Harrison

Cecala next directs the court's attention to the affidavit of Sheryl W. Harrison, Ph.D., a psychologist who treated Cecala for "major depression" on an "irregular basis" from February 15, 1999, until February 17, 2000. (PSOF Ex. 22 at 1.) She also "saw Renee a few times in 2003," and began seeing her "regularly" in 2005. (*Id.* Ex. 22 at 1.) During that period, Dr. Harrison referred Cecala to a psychiatrist, Dr.

Stonnington, "so that Renee could obtain the benefit of psychological counseling from [Dr. Harrison] and medications from Dr. Stonnington." (*Id.* Ex. 22 at 2.) Dr. Harrison believes that she would have seen Cecala more often if, while living in Arizona, Cecala had been able to leave her home. (*Id.* Ex. 22 at 1.)

In her affidavit, Dr. Harrison expresses a variety of medical conclusions. The affidavit does not, however, include "specific facts" or any other "hard evidence" of Cecala's functional incapacity. For example, Dr. Harrison opines, without reference to facts, that between February 1999 and February 2000, she observed that Cecala displayed and expressed "suicidal ideation." (*Id.* Ex. 22 at 2.) Dr. Harrison also expresses the view that Cecala "was unable . . . to maintain any type of employment," "unable to care for herself adequately," "[unable] to maintain basic hygiene," and "[unable] to make decisions about things as simple as what to wear." (*Id.* Ex. 22 at 2.) This is the only foundation for Dr. Harrison's conclusion that Cecala "lacked the ability to pursue her legal rights." (*Id.* Ex. 22 at 2.) The affidavit fails to defeat Newman's Motion under Arizona substantive and federal procedural law.

Furthermore, Dr. Harrison's observations are limited to the one-year period of treatment between February 1999 and February 2000. Even if her conclusory averments did create a genuine issue of material fact as to Cecala's inability to manage her daily affairs during that one-year period, they fail to create a triable issue as to the balance of the disability period.

#### c. Dr. Wilson

C. Brady Wilson, Ph.D., assessed Cecala's psychological status in light of the litigation record, a psychological examination, one face-to-face interview on November-

ber 29, 2006, and two telephonic interviews on December 11, 2006, and December 13, 2006. (PSOF Ex. 30 at 3.) This is the foundation for Dr. Wilson's conclusion that Cecala suffers various cognitive impairments and that this condition "deteriorated most significantly" between 1999 and 2003. (*Id.* Ex. 30 at 14.) He conclusorily avers, without recitation of the supporting facts, that "the degree of [this] impairment establishes that she was 'not of sound mind' during the operative period." (*Id.* Ex. 30 at 14.) This unsubstantiated conclusion is insufficient to create a genuine issue of material fact as to Cecala's inability to manage the day-to-day affairs of human existence as to that period of time.

#### ii. Declarations of Family and Friends

Cecala's father, mother, brother, sister, first cousin, and close friend have submitted declarations in support of Cecala's claim of unsound mind. (*Id.* Ex. 23; 24; 25; 17; 27; 26.) These poignant declarations show that Cecala was deeply troubled from June 1999, through November 2002, and that her mental health did not begin to improve until 2003. However, the declarations, whether standing alone or read in conjunction with Cecala's expert's affidavits, fail to create a triable issue of material fact as to whether Cecala was "simply incapable of carrying on the day-to-day affairs of human existence" from June 21, 1999, through at least November 21, 2002. *Florez,* 185 Ariz. at 526, 917 P.2d at 255. The proffered evidence of unsound mind shows, at most, that Cecala suffered from depression and post-traumatic stress disorder during the operative period, and that Cecala's fragile psychological state often made it difficult, but not impossible, for her to perform some of the every-day tasks of human existence. The declarations do not create a genuine issue of material fact as to Cecala's total *inability*

to perform those tasks throughout the operative three year and five month period. In reviewing these declarations, the court does not consider testimony lacking in foundation as to the date of the conduct.

### a. 1999

Having discharged her lawyer, Cecala herself declared that she actively pursued new representation from Ferguson Stein in July 1999, where she "talked about my case, and my need of representation." (Doc. 182 Ex. B at 1.) Cecala did not succeed in retaining new counsel, and she began to prepare the case on her own. (PSOF Ex. 23 at 6) ("There was a sea of yellow note paper. I recall being sick with worry that Renee was having to do or least trying to do so much for her case.") As a threshold matter, Cecala's testimony fails to create a triable issue as to whether Cecala was unable to perform day-to-day activities at the time that her intentional tort and non-litigation fiduciary breach claims accrued in June 1999.

In August 1999, Cecala telephoned her brother, Randal Cecala, in an effort to explain the traumatic events of the past year. (*Id.* Ex. 25 at 3.) Randal Cecala decided to travel to Phoenix to comfort his sister at that time. He "found the house she had been living in littered with stacks of papers and books," relating to Cecala's pro se representation before the arbitral tribunal, and he was "shocked at how she looked." (*Id.* Ex. 25 at 3.) He decided to ask Cecala to move in with him and his wife, Christine Cecala, in St. George, Utah. Randal Cecala helped Cecala to pack her things, and Cecala "seemed to fade in and out." (*Id.* Ex. 25 at 4.) Although she "seemed tired and weak," Cecala was able to assist with the packing and the moving process. (*Id.* Ex. 27 at 4.)

Cecala suffered psychologically while living at his brother's Utah home in 1999; she had nightmares and battled depres-

sion. (*Id.* Ex. 25 at 4.) However, it is also undisputed that Cecala was able to perform basic legal research relating to her underlying employment claim against NationsBank during that time. (*E.g., Id.* Ex 25 at 4 ("when she had energy to work, it was usually at night when everyone else had left the building").) Having failed to retain counsel, Cecala went on to prepare for the final arbitration hearing scheduled for October 1999 on her own. With the assistance of her father, Don Cecala, and her brother Randal, Cecala was also able to write checks and exercise some control over her financial affairs. (DSOF 171; Ex. 17.) She was also able, by her own admission, to go shopping for basic necessities at Wal–Mart on her own, schedule and keep appointments for personal grooming, and purchase airplane reservations for travel to Phoenix for medical appointments. (*Id.* 171–72; PSOF Ex. 23 at 9.) Cecala was not able to work at this time.

### b. 2000

In late 1999 to January 2000, after conducting legal research on the subject, Cecala decided to investigate the possibility of suing Newman for malpractice. (DSOF 163.) As evidenced by her personal notes, Cecala also called Ferguson Stein around that time to discuss "avoiding any decision of the arbitrators" in the underlying employment dispute against NationsBank. (Doc. # 182 Ex. B at 1.) She directed her friends and family to copy exhibits for that purpose. (PSOF Ex. 27 at 5.) Cecala's mental condition appears to have been improving at this time. (*Id.* Ex. 25 at 5.)

The February 10, 2000 decision of the NASD tribunal caused Cecala to slip "back into isolation" and depression. (*Id.* Ex. 25 at 5.) She "went through periods where sometimes she would spend days in the office," in a futile effort to vacate the ad-

verse decision. (*Id.* Ex. 25 at 5.) After making multiple telephone calls, Cecala was able to obtain some limited legal advice from attorney Mickey Abraham, who subsequently represented Cecala at the Court of Appeals for the Fourth Circuit. (Doc. # 182 Ex. B at 2.) Cecala moved in with her father and mother in the fall of 2000, where, although able to "visit with family and a few select friends," she "would otherwise keep to herself with minimal social contact." (PSOF Ex. 25 at 6.) Her father avers that "she was unable to care for herself without a lot of help" at this time. (*Id.* Ex. 23 at 10.)

#### c. 2001

Cecala traveled from Utah to Phoenix for appointments with her psychiatrist throughout 2001. (*Id.* Ex. 27 at 5.) She also applied for Social Security with the assistance of her family. (DSOF 194.) Around April 2001, "Renee suffered a major setback when [the district] [c]ourt ruled against her in an attempt to try to overturn the arbitration award." (PSOF Ex. 25 at 6.) Cecala had represented herself before the federal district court. Although her depression deepened, Cecala admits that she continued to independently perform basic tasks outside her parents' home, such as shopping, throughout 2001. (DSOF 187.)

#### d. 2002

Cecala "again contacted [Ferguson Stein] in early 2002, to discuss representation in pursuing Mr. Newman for malpractice." (Doc. # 182 Ex. B at 2.) Cecala also retained Mickey Abraham to represent her on appeal of the district court's decision upholding the arbitral award. (*Id.* Ex. B at 2.) The July 12, 2002 decision of the Court of Appeals for the Fourth Circuit sent Cecala into yet another period of "extreme depression." (PSOF Ex. 25 at 8.) Yet even while despairing of the most recent of her multiple litigation losses, the

undisputed evidence shows that Cecala remained capable of independent action. Cecala went on vacation with her friend Maureen Tatum, during which time she remained quiet and reserved but otherwise was able to take care of herself. (*Id.* Ex. 27 at 6.) In late 2002, she began drafting a complaint against Newman and his law firm for malpractice, which she filed pro se on April 18, 2003. (Doc. # 171 at 11.) Cecala moved from Utah back to the Phoenix area with her parents at the end of 2002. (PSOF Ex. 23 at 12.)

#### iii. Rule 56(c) Declarations

The court heard oral argument on Newman's Motion on March 28, 2007. After the close of business on March 27, 2007, on the eve of that hearing, Cecala submitted six new declarations in opposition to Newman's Motion for Summary Judgment. (Doc. # 224.) The declarations of Cecala and her friend Diann Draeger were offered in support of Cecala's unsound mind claim. (*Id.* Ex. 1–2.) Cecala contends that her declarations were justified by Fed.R.Civ.P. 56(c), which provides in relevant part, "The adverse party prior to the day of hearing may serve opposing affidavits." Newman objected to the admissibility of Cecala's declaration, but did not challenge any of the other submissions. (Doc. # 227 at 2.)

The authority marshaled by Newman against and Cecala in support of the challenged declaration is inapposite. (Doc. ## 227 at 2; 224 at 1; 238 at 3–4.) *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975), and *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir.1991), were predicated upon district court factual determinations that the non-moving parties were attempting to fabricate material issues of fact by resort to a "sham" affidavit contradicting their own deposition testimony. Cecala does no such

thing. *Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996), deals with new evidence presented by the *movant* in a *reply* to a motion for summary judgment. That case is of little moment here.

Cecala's March 27, 2007 declaration was untimely under LRCiv 56.1(d), a local rule setting time limits for filing an opposition to summary judgment. Neither Newman nor the court had an opportunity to read Cecala's declaration before the commencement of oral argument on the morning of March 28, 2007. This is the evil to which LRCiv 56.1(d) is directed. Newman could have objected to the Cecala declaration on this ground. *Marshall v. Gates,* 44 F.3d 722, 725 (9th Cir.1995) (Rule 56(c) "does not unconditionally require a district court to accept affidavits up to the date set for hearing on the motion for summary judgment" where a valid local rule "places a condition on that right."); *Transamerica Corp. v. Transamerica Bancgrowth Corp.,* 627 F.2d 963, 966 (9th Cir.1980) (enforcement of local rules subject to review for abuse of discretion only). Having failed to do so, Cecala's Rule 56(c) declaration will be admitted into evidence.

However, neither unsound mind declaration bolsters Cecala's claim for statutory tolling. Cecala contends that she did "not have the mental, emotional, or physical capacity to pursue a lawsuit against the defendants any earlier than November 2004." (*Id.* Ex. 1 at 5.) However, the uncontroverted evidence discussed above proves just the opposite. She contends that there were "always trade-offs" regarding her ability to concentrate and "attend to very discrete daily tasks," but does not deny that she could manage her personal grooming, attend to financial affairs, and travel to Arizona for medical appointments during at least some of the claimed period of disability. (*Id.* Ex. 1 at 5–6.) The declaration of Diann Draeger is similarly unavailing. Ms. Draeger offers no hard evidence of functional disability. She merely elaborates upon the now familiar averments of Cecala's experts, friends, and family as to Cecala's unkempt appearance, depression, and general malaise in the summer of 1999. (*Id.* Ex. 2 at 11–13.)

### 5. Conclusion

Cecala's expert testimony fails to create a triable issue because it is lacking in factual and temporal foundation, and asserts, with few exceptions, unsubstantiated conclusions rather than "hard evidence" of functional disability. *Florez,* 185 Ariz. at 526, 917 P.2d at 255. Although they are also lacking in temporal foundation in some instances, the declarations from Cecala's family and friends are generally grounded in facts rather than conclusory averments. However, when viewed in the light most favorable to Cecala, these declarations at most portray a picture of a woman who, while suffering varying degrees of psychological trauma relating to her litigation loss and the sexualization of the attorney-client relationship, was consistently able to carry on the day-to-day affairs of human existence, such as shopping, managing her financial affairs, and traveling from Utah to Arizona for medical appointments.

The Cecala and Draeger Rule 56(c) declarations are also insufficient. The "trade-offs" in attending to everyday activities, depression, and the lack of concentration testified to by them, whether standing alone or read in conjunction with the supporting declarations of her experts, friends, and family, do not create an issue of fact as to Cecala's inability to manage her day-to-day affairs or recognize her legal rights and liabilities from June 21, 1999, through at least November 21, 2002.

Finally, the court's complete review of Cecala's own evidence shows that at the relevant times she actually did the ulti-

mate thing the unsound mind exception aims to prove she could not do: pursue litigation. She prosecuted, directly and later with counsel, the Nations Bank arbitration and litigation. She conferred with counsel, researched, and prepared litigation against Newman. She now asks the court to allow a jury to find that she could not do the very thing she was doing. This defiance of plain facts and plain meaning would make foolery of the unsound mind exception.

Cecala's claims for intentional infliction of emotional distress and non-litigation damages for breach of fiduciary duty are barred by A.R.S. § 12–542.

### D. Equitable Tolling Is Unwarranted

■ Cecala alternatively contends that the statute of limitations governing her intentional tort and non-litigation fiduciary breach claims should be equitably tolled "to prevent Defendants from benefitting from their own misconduct." (Doc. # 193 at 11.) Cecala urges the court to invoke its "inherent power" to disregard the statutory limitations period so as to resolve Cecala's claims-which target "severe, outrageous and prejudicial attorney misconduct"—on the merits. (*Id.* at 11.)

Although Cecala alleges grave departures from the standards of conduct governing the attorney-client relationship, neither the egregiousness of the breach nor the seriousness of the resulting injury are alone sufficient to justify equitable tolling. Cecala has cited no authority for the proposition that the two-year limitations period, which is designed to "protect defendants and courts from stale [and fraudulent] claims where plaintiffs have slept on their rights," may be overcome on such a showing. *Doe,* 191 Ariz. at 322, 955 P.2d at 960 (citation and internal quotations omitted). Nor has she referred the court to any authority in support of her contention that the limitations period

may be tolled to protect a plaintiff who, though aware of her right of action, knowingly "slept on her rights" so as to avoid prejudicing a decision-maker in an independent, though admittedly related, judicial proceeding by suing a lawyer she had discharged long before. (Doc. # 193 at 11.)

*Hosogai v. Kadota,* 145 Ariz. 227, 231, 700 P.2d 1327, 1331 (1985), does not support Cecala's argument for equitable tolling. The plaintiff in *Hosogai* filed a wrongful death action within the limitations period, but the action was dismissed for defective service of process. The court permitted the plaintiff to bring a new action against the same defendant for the same tortious conduct despite the fact that the limitations period had run because (1) the plaintiff had timely noticed the defendant by filing a claim within the limitations period; (2) the defendant was not prejudiced in the second action; and (3) plaintiff acted reasonably and in good faith in prosecuting the first action and diligently filing the second action. *Id.* 145 Ariz. at 233, 700 P.2d at 1333. None of those circumstances applies here.

### VII. Causation

Newman next urges summary judgment against Cecala's remaining causes of action for attorney negligence and litigation-injury fiduciary breach for failure to prove a prima facie case of malpractice under Arizona law. Newman more specifically contends that Cecala has failed to present a triable issue as to the "causative link" between the alleged misconduct and the loss of Cecala's claims against NationsBank. (Doc. # 171 at 11–12.)

### A. Cecala's Theory of Causation Is Insufficient

■ Cecala proposes to prove "causation in this case" with testimony from

North Carolina employment attorney Robert M. Elliot ("Elliot"). (Doc. ## 230 at 3; 236 at 7.) Cecala submits that Elliot will "guide [the jury] through the arbitration transcript and related facts that he opines caused or contributed to Newman losing the case." (Doc. # 230. at 7.) Elliot's opinion as to "the adverse effect of [Newman's] conduct on the outcome of the [underlying] case" was disclosed in his December 14, 2006 affidavit. (*Id.* at 3.) Elliot devotes essentially all of that 26–page affidavit to describing Newman's breaches of the standards of care and conduct. (PSOF Ex. 14.) Finally, Elliot states, "In my opinion ... all of [D]efendant's failures in combination, caused or contributed to the loss of Ms. Cecala's underlying employment claims." (*Id.* Ex. 14 at 25.)

Depending on the causation issues to be resolved by the malpractice jury, expert testimony on causation may be impermissible, permissible, or even necessary. *Asphalt Engineers v. Galusha*, 160 Ariz. 134, 770 P.2d 1180 (Ct.App.1989) (discussing the use of expert testimony in legal malpractice actions); 4 *Legal Malpractice* § 33:17 at 1118–19 ("Expert testimony may be essential for the plaintiff to establish causation. The trier of fact must be able to determine what the result should have been, if the lawyer had not been negligent.... [U]nless the causal link is obvious or can be established by other evidence, expert testimony may be essential to prove what the lawyer should have done."); *see Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir.1995) (citing cases on expert affidavits in opposition to summary judgment). The court need not decide whether such expert evidence is permissible or necessary in this case because neither Cecala nor her experts have presented any evidence or reasoned explanation as to why she should have won her arbitration but for Newman's alleged negligence and fiduciary breach. "Net opinions" of the type advanced by Elliot are

insufficient. 4 *Legal Malpractice* § 33.18 at 1141 (a "net opinion" is "an opinion that does little more than restate the allegations of the complaint"); (PSOF Ex. 14 at 6) ("In reaching this opinion, I have assumed the facts stated in Ms. Cecala's First Amended Complaint.").

Elliot's December 14, 2006 affidavit fails to present any evidence of causation as a matter of law. Without factual foundation, Elliot would simply tell the jury that Cecala would have prevailed if Newman had done things differently. (Doc. # 230 at 7.) Elliot asks the court to take his word for it. This he may not do. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir.1993) ("When the nonmoving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."); *LeapSource*, 351 B.R. at 704 (summary judgment for defendant-attorney under Arizona law where plaintiff-client's expert testimony on causation lacked foundation in specific facts and admissible evidence). If Elliot has more to tell the jury than he has told the court, he may not hold back now and thus exempt Cecala from the summary judgment process.

Elliot's December 14, 2006 affidavit says that the result in the underlying action would have been different if Newman had been admitted to practice law in North Carolina, or prepared more assiduously for trial, or volunteered legal advice that his client did not seek, or filed a charge of discrimination with the Charlotte division of the EEOC, or challenged the enforceability of the arbitration agreement in a judicial forum, or exercised greater care in the selection of the arbitrators, or obtained some unspecified documentary evidence from NationsBank by pursuing a more aggressive discovery strategy, or abstained from sexual intercourse with his client, or

adopted a more cohesive trial strategy, or returned Cecala's client file after he was discharged by her and before the arbitration concluded. (PSOF Ex. 14.) But the expert makes no attempt to substantiate any of these claims with any facts or reasoned analysis. He does not discuss any missing evidence or say how it would have changed Cecala's fate.

It is specifically fatal to his conclusion that Elliot avoids any discussion of the numerous legal, factual, and credibility problems that plagued Cecala's arbitration claims, problems that are apparent from even the most cursory perusal of the arbitration transcript.

Cecala's opposition papers also include "net opinions" on loss causation from fiduciary breach from Professor Hazard, an expert on legal ethics, and Dr. Rutter, Cecala's consulting psychiatrist. These opinions assume everything and help the jury with nothing. *See* Fed.R.Evid. 702 (expert opinions must assist the trier of fact). Though they merit little discussion, the Hazard and Rutter affidavits will be addressed for the sake of completeness below.

### B. Procedural Issues

The Motion puts Cecala "on notice that [Defendants] are putting her to her *Celotex* burden as to all her theories, not just those raised in this Motion." (Doc. # 171 at 12.) Cecala objects to Newman's motion practice, claiming that she had "no notice or opportunity to brief any specific objection" relating to the sufficiency of her causation evidence. (Doc. # 230 at 5 n. 4.) This argument lacks merit. Newman has carried his initial burden of production, and causation for each of Cecala's malpractice claims is properly before the court in a summary judgment posture. *High Tech Gays,* 895 F.2d at 574.

### 1. Newman Carried His Initial Burden Under Rule 56(c)

██ "[A] party seeking summary judgment always bears the responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (internal quotations omitted). In *Nissan Fire & Marine,* the Ninth Circuit interpreted *Celotex* as follows:

> [U]nder ... *Celotex,* a moving party without the ultimate burden of persuasion at trial may carry its initial burden of production by either of two methods. The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. The first method ... may be more commonly employed ... [b]ut this does not mean that the second method, at issue in *Celotex,* is legally disfavored. The Supreme Court has clearly indicated that, in appropriate cases, a moving party may carry its initial burden of production by showing that the nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at trial.

210 F.3d at 1105–06.

██ The nonmovant "must have had sufficient time and opportunity for discovery before a moving party may be permitted to carry its initial burden of production by showing that the nonmoving party has insufficient evidence." *Id.* at 1105–06. This requirement prevents the movant

from "railroading" the opposing party with a premature "no evidence" motion for summary judgment. *See* Fed.R.Civ.P. 56(f).

■ Newman satisfied his initial burden of production. He contends that Cecala's evidence fails to create a genuine issue of material fact as to whether Cecala should have prevailed at the NASD but for her attorney's malpractice. (Doc. # 171 at 12–17.) He explains why the claims of negligence in the selection of the arbitral forum and negligence in the prosecution of the Title VII case are insufficient as a matter of law. (Doc. # 171 at 13–17.) Newman also noted the insufficiency of evidence of causation in general. No more is required of him under *Celotex* and *Nissan Fire & Marine.*

In her Response, Cecala avers that "[a]ll of her claims are fully supported by the evidence, reasonable inferences, and expert witness testimony," and she attempts to substantiate that claim by reference to her Statement of Facts. (Doc. # 193 at 1.) Cecala's later contention that she "had no notice or opportunity to brief" the causation issues (Doc. # 230 at 5 n. 4) is also belied by her statements during the March 28, 2007 oral argument. *E.g.*, (Doc. # 239 at 35–39) ("We laid out why there was causation. We laid out why there was a winning case."). Finally, the court invited supplemental briefing on the legal standards governing proof of causation in an action for legal malpractice. Cecala responded with 14 pages of briefing. (Doc. ## 230, 236.)

■ Cecala may not proceed on the "mere hope that trial would produce evidence she was unable to garner at the state of summary judgment." *Parker v. Federal Nat'l Morg. Ass'n*, 741 F.2d 975 (7th Cir.1984). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order see whether there is a genuine need for trial." Fed.R.Civ.P. 56, Advisory Comm. note to 1963 amend. Cecala's opposition papers do not point to any admissible evidence ignored or overlooked by Newman. Cecala's responsive memorandum does not contain any reasoned analysis from which a reasonable juror, drawing all reasonable inferences in her favor, could find that Cecala should have prevailed against NationsBank but for Newman's malpractice. *Shumway*, 199 F.3d at 1103–04. There is no basis for trial here because Cecala has failed to link any allegation of malpractice contained in the Second Amended Complaint to the loss of her claim in the arbitral forum.

## 2. Cecala's Supplemental Expert Affidavit Was Untimely

■ The second procedural issue is the timeliness of Elliot's Supplemental Affidavit. (PSOF Ex. 16.) The March 6, 2006 Case Management Order, as amended, (Doc. ## 94, 148) set a December 14, 2006 deadline for the disclosure of Cecala's expert witnesses required by Fed.R.Civ.P. 26(a)(2)(B). The court has repeatedly emphasized that the deadlines prescribed by Case Management Order are not precatory.

The opinion of Cecala's standard of care expert was first disclosed on December 14, 2006, in compliance with the Case Management Order. (PSOF Ex 14.) Included in Cecala's March 5, 2007 opposition papers, however, were sixteen pages of new testimony from attorney-expert Elliot. (*Id.* Ex. 16.) Although styled as a "Supplemental Affidavit," and offered for "clarification purposes," Elliot's submission is in fact a belated attempt to provide some foundation for his previous wholly unsubstantiated assertion that Newman's multiple "failures in combination, caused or contributed to the loss of Ms. Cecala's underlying employment claims." (Doc. # 238 at 4; PSOF Ex. 14 at 25.)

Elliot does not contend that supplementation was required to account for new information not known to him at the time of his original report. Nor does the expert attempt to justify his untimely report on any other ground contemplated by Fed.R.Civ.P. 26(e)(1) or 37(c)(1). Instead, Elliot submits that his additional testimony was necessitated by Newman's counsel's failure to inquire during his February 6, 2007 deposition as to the undisclosed foundation for his original opinion on the subject of causation. (PSOF Ex. 16 at 2.) That argument is without merit.

■ It is the obligation of the party making belated disclosure to show justification or harmlessness. *Wilson v. Bradlees of New England, Inc.,* 250 F.3d 10, 21 (1st Cir.2001) (quoted in *Yeti By Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1107 (9th Cir.2001)). Elliot's March 5, 2007 submission was two and a half months late. The Supplemental Affidavit is prejudicial to Newman and, having been filed after the applicable deadline without substantial justification, it will be excluded pursuant to Fed.R.Civ.P. 37(c)(1).

■ In her opposition memorandum, Cecala contends that Newman's March 30, 2007 Motion to Strike Elliot's Supplemental Affidavit was unauthorized and untimely in its own right. (Doc. # 238 at 1–2.) Newman's Reply on the Motion for Summary Judgment objected to the legal sufficiency of Elliot's Supplemental Affidavit, but did not challenge its untimely disclosure. (Doc. # 206 at 10–11.) At oral argument, Newman objected more specifically to the belated supplementation, followed by a written objection to the same effect. (Doc. # 227.)

Though one could view it different ways, the court concludes that the timeliness objection raised at oral argument was sufficient. First, the timeliness objection to late expert testimony could be raised at trial even if it was lost for summary judg-

ment. Absent some other unfairness to Cecala on summary judgment, there is no purpose to denying summary judgment based on evidence that would be excluded at trial, resulting in judgment as a matter of law and a wasted trial. Second, Cecala is not prejudiced by Newman's raising the timeliness objection at oral argument because Cecala could have done nothing to save the affidavit if Newman had objected more clearly in their reply brief. Third, the court's authority to enforce case management deadlines is well established. "[T]he district court has an interest in the efficient management of its docket. Whenever a party, without good cause, neglects to comply with reasonable deadlines, the court's ability to manage its docket is compromised. Courts are entitled to take sensible measures to guard against such debilitating occurrences." *Santiago–Diaz v. Laboratorio Clinico,* 456 F.3d 272, 277 (1st Cir.2006).

It would be unfair to force Newman to respond with any specificity to the opinions first disclosed in Elliot's Supplemental Affidavit. *See Yeti By Molly,* 259 F.3d at 1107 (litigant not required to depose opposing party's damages expert when that expert's report was not timely disclosed); *Santiago–Diaz,* 456 F.3d at 277 ("[P]laintiff's foot-dragging in . . . providing his report deprived defendants of the opportunity . . . to prepare their defenses."). Newman's Motion to Strike Elliot Supplemental Affidavit (Doc. # 227) will be treated as an objection and will be granted as such. The Motion may have been proper as a motion to strike since the very filing of the document was challenged, but in any event its function as an objection was clear.

Newman is entitled to summary judgment on Cecala's claims for loss of her arbitration claims. For the sake of thoroughness and to further show the general

lack of actionable negligence itself, the specifics of both Elliot's Original and Supplemental Affidavits will be addressed below.

### C. Causation Evidence from Elliot's Affidavits

Even if it were admitted, Elliot's Supplemental Affidavit fails to supply a causal nexus between the allegations of attorney malpractice and the loss of Cecala's arbitration claims. Elliot elaborates upon his original, summary conclusion, but his out-of-time averments offer no reasoned analysis of the Bank's evidence or explanation how every reasonable trier of fact should have disregarded the Bank's cumulative controverting evidence, Cecala's concessions on cross-examination, and her general failure of credibility at the arbitration hearing. When stripped of its extra words without extra content, Elliot's Supplemental Affidavit, like its predecessor, asserts causation by faith alone.

### 1. Newman's "Ineffective Representation"

Elliot ignores the pervasive contradictory evidence and credibility problems in the arbitration transcript and confirmed by the court's own review of that record and instead asserts that "through [Newman's] ineffective presentation, facts which would have supported Ms. Cecala's claims were lost or buried in a mass of irrelevant and repetitive evidence." (PSOF Ex. 16 at 4.) Elliot also asserts that Cecala's lack of credibility can somehow be attributed to Newman's ineffective witness preparation, rather than upon the multiple instances in which her testimony was directly impeached by opposition witnesses and contradictory facts. (*Id.* Ex. 14 at 18.) He avers that "Mr. Newman's presentation of Ms. Cecala's case, both through Ms. Cecala's testimony and the testimony of other witnesses on direct and cross examination was extremely disjointed." (*Id.* Ex. 14 at

22.) He adds that the "clarity, focus, and priority of the most important and favorable evidence which are indispensable to an effective presentation to the fact finder was sacrificed through Mr. Newman's lack of preparation." (*Id.* Ex. 14 at 22.) Elliot then concludes that effective presentation of the record evidence would have led the arbitrators to find in Cecala's favor. (*Id.* Ex. 16 at 11; Doc. # 230 at 7.)

"In a suit complaining of the manner in which proof was presented and the manner of examination and cross-examination of witnesses, only by pure guesswork can the verdict of a jury be examined and a so-called cause for that verdict be determined. No man shall suffer a judgment against him based on guess." *Stricklan v. Koella*, 546 S.W.2d 810, 813 (Tenn.Ct.App. 1976); *McKnight v. Dean*, 270 F.3d 513, 518 (7th Cir.2001) (Legal malpractice is "not a synonym for undistinguished representation." It is not "a failure to be brilliant, but a failure to come up to even a minimum standard of professional competence."). Elliot's conclusory opinion as to the dispositive effect of more zealous representation is entirely speculative.

Elliot provides no specific explanation *why* a jury in this action could conclude that Cecala's testimony should have been believed and the phalanx of contradicting witnesses all disbelieved if she had been favored with more diligent preparation and more "effective presentation to the fact finder" by her lawyer. (PSOF Ex. 14 at 22.) He simply asks the court to take his word for it. (*E.g., id.* Ex. 16 at 7 ("Mr. Newman's failure to prepare for Ms. Cecala's arbitration hearing [ ] permeated every aspect of his performance. Undoubtedly, his departures in this respect contributed to or caused the loss of Ms. Cecala's claims.").) This is not sufficient. *See Estate of Re*, 958 F.Supp. at 907, 921, 924 (plaintiffs failed to show that there should

have been a different result in arbitration if the attorneys adopted the litigation strategies urged by them).

## 2. Improper Selection of and Hostile Attitude Toward the NASD Arbitrators

Similarly unavailing is Elliot's attack on Newman's selection of and behavior toward the NASD arbitrators. (PSOF Ex. 14 at 15; Ex. 16 at 7–8.) Elliot states, "The transcript of [the arbitration] proceedings in May–June 1999, reflects that the panel members were becoming more and more impatient with Mr. Newman's long and repetitive questioning of witnesses on matters of which the witnesses claimed no knowledge, or matters consistent with Mr. Newman's pleadings, or matters which the panel had ruled were objectionable for one reason or another." (*Id.* Ex. 16 at 8.) When the panel objected to Newman's line of questioning, Cecala's expert avers that "Mr. Newman became rude, sarcastic and insulting to the panel members," which in turn drew stern admonishments from the tribunal. (*Id.* Ex. 16 at 8.) Newman's display of "contempt" toward the fact finders who held "his client's legal fate" led Elliot to conclude that Newman's behavior "probably destroyed" Cecala's case and extinguished any chance of recovery. (*Id.* Ex. 16 at 9.)

Taking these premises as true, they would not permit a reasonable jury to conclude that Cecala otherwise should have won and that the arbitrators put aside law and evidence to punish her for her lawyer's tactlessness. A finding of causation from lawyer demeanor would be grounded in speculation about how a "better" result should have occurred. 4 *Legal Malpractice* § 30:40 at 611–12. Such an inference would run counter to public policy. "Allowing proof of whether a jury was prejudiced [by attorney demeanor] is inconsistent with the assumption that the trier of fact acted impartially" and "pre-

supposes an improper response by the trier of fact." *Id.* at 611–12. This is illustrated in *Holley v. Massie*, 100 Ohio App.3d 760, 654 N.E.2d 1293 (Ct.App. 1995), where the attorney repeatedly fell asleep at deposition and trial, allegedly leading the jury to formulate a prejudicial inference about the merits of the plaintiff's case. In upholding summary judgment for failure to prove causation of cognizable injury, the court emphasized that the jury was presumed to have deliberated on evidence, not the conduct of counsel. "To permit the sanctity of the jury room to be broken to determine how jurors reacted to the demeanor of counsel during the trial would seriously undermine the stability and continued efficacy of trial by jury." *Id.* at 767, 654 N.E.2d at 1297.

Furthermore, there is a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). That policy is served in part by the presumption that arbitral tribunals are fully capable of adjudicating statutory claims in a neutral and unbiased manner. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 747 (9th Cir.2003); *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 368 (7th Cir.1999); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 15 (1st Cir.1999).

Cecala cites *Berkeley v. Liddle*, 247 A.D.2d 231, 668 N.Y.S.2d 354 (App.Div. 1998), in support of her contention that Newman's "unwarranted, angry and belligerent behavior in arguing his client's case to the trier of fact is alone, without anything more, sufficient evidence of malpractice to go to the jury." (Doc. # 193 at 17.) That case held, without any recitation of operative facts, that "issues of fact exist

precluding summary judgment, including whether the demeanor of the attorney who represented the client in arbitration was so belligerent as to be offensive to the panel and prejudice the client's case." *Berkeley,* 247 A.D.2d at 231, 668 N.Y.S.2d at 354. The emphasis of the court's summary decision was not on the lawyer's belligerent attitude, but rather his negligence in developing expert witness testimony. *Id.* at 231, 668 N.Y.S.2d 354, 688 N.Y.S.2d at 354–55. Nevertheless, in submitting the case to a jury in part upon a showing of attorney belligerency, the court failed to account for the speculation inherent in the inference of causation from "offensive" lawyer demeanor, and disregarded the policy considerations implicated by a challenge to the impartiality of the finder of fact. The case is also inconsistent with the requirement of proof of what any reasonable trier should have found, not what the original trier of fact would have found. *Phillips,* 152 Ariz., at 418, 733 P.2d at 303. The *Berkeley* decision, which has been criticized by at least one commentator, 4 *Legal Malpractice* § 30:40 at 611–12, is contrary to Arizona law and finds no support in the New York cases.

Elliot's related averment that Newman "departed from the standard of care in failing to investigate, evaluate and exercise professional judgment as to the selection of the arbitrators who served on the arbitration panel" must also be rejected. This conclusion is inherently speculative and contrary to public policy. As summarized by one commentator, "Causation issues and important public policy considerations usually preclude a cause of action ... for error concerning the selection, voir dire, or general jury process. Since basic policy dictates that either trier of fact should be equally fair, a lawyer should not be liable for choosing one over the other." 4 *Legal Malpractice* § 30:39 at 595–96. It follows that "[a]llowing proof that a judge is not fair, less reasonable or less generous is

contrary to the concept of judicial impartiality." *Id.* at 596. Permitting "such a contention to be made, expressly or impliedly, in a legal malpractice action is antithetical to sound public policy." *Id.* at 596; *see Estate of Re,* 958 F.Supp. at 923 (criticizing the position, abandoned by plaintiffs themselves, that the selection of an arbitrator could be actionable malpractice). Moreover, even if an inference of injury were permissible on this ground, Elliot advances no rationale for gainsaying Newman's choice of arbitrators. (PSOF Ex. 14 at 15.)

### 3. Inadequate Discovery: Failure to File with the EEOC

Yet another theory of causation advanced by Elliot is that Newman would have discovered additional supportive evidence if he had filed a charge of discrimination with the Charlotte Division of the EEOC. (PSOF Ex. 14 at 11–13.) Newman observes that "through the EEOC procedures, the attorney for the employee will ultimately have access to preliminary 'discovery' in the factual record developed by EEOC, regardless of EEOC's disposition of the charge; and under EEOC's mediation procedures, there is a more effective opportunity for early settlement, avoiding the time and expense of litigation." (*Id.* Ex. 14 at 12.) He further asserts that foregoing the discovery opportunities and "roadmap" for trial preparation that would have been generated by the EEOC process led to the "destruction" of Cecala's claims. (*Id.* Ex. 16 at 4.) However, this conclusory averment does not provide a sufficient basis for a jury to conclude that Cecala *should* have won in the underlying action.

■■■ Elliot's opinion as to the practical effect of Newman's strategic decision to forego the EEOC process is entirely speculative. He does not specify, for example,

what evidence Newman might have disgorged from NationsBank with the assistance of the EEOC, or how those additional facts, if discovered, should have led to a different outcome. He avers only that the filing of a charge with the EEOC would have facilitated discovery, creating "leverage" against the employer, and the "opportunity for early settlement," thereby "avoiding the time and expense of litigation." (*Id.* Ex. 14 at 12.) But such abstract pronouncements cannot take the place of actual proof. Causation must be inferred from facts, not from bare expert endorsement. *See Allbritton v. Gillespie, Rozen, Tanner & Watsky, P.C.,* 180 S.W.3d 889, 892 (Tex.App.2005) (rejecting "[t]ake my word for it, I know" affidavits from attorney-experts in legal malpractice actions).

■ Cecala has the burden of establishing not only what Newman should have uncovered during the discovery processes, but also that use of the information should have produced a better result. *See Ross v. Adelman,* 725 S.W.2d 896, 897 (Mo.Ct.App. 1987) ("The record is . . . totally devoid of any proof that [the result would have been different] had respondent made the investigation [urged by appellants]. . . . That proof by appellants is essential to their claim. This lack of evidence is fatal to appellants' case because there is no showing that any acts or omissions complained of caused appellants to sustain damage."). Elliot's testimony provides no basis from which a juror could reasonably conclude that Cecala should have prevailed against NationsBank if her lawyer had actually engaged the EEOC and employed that legal process to his client's advantage. Elliot's lost opportunity for discovery theory fails, as a matter of law, to support a reasonable jury inference of loss causation.

### 4. Loss of a Procedural Advantage: Foregoing Litigation

Elliot next avers that Newman's decision to proceed directly to arbitration itself caused Cecala to lose her claim. He contends that the "waiver of any opportunity of litigation" had "serious repercussions" because it resulted "in some loss in the rights of discovery" and also led to "the loss of a trial by jury." (PSOF Ex. 14 at 13.) This too is insufficient for a jury to find causation and insufficient as a matter of law for legal malpractice.

Elliot provides no factual support for his contention that Cecala lost her claim in the arbitral forum simply because her lawyer opted to litigate there. *See Stroock & Stroock & Lavan v. Beltramini,* 157 A.D.2d 590, 591, 550 N.Y.S.2d 337, 338 (App.Div.1990) ("Counsel's decision to proceed before the courts rather than in arbitration *at worst* amounts to an error in professional judgment which does not rise to the level of malpractice.") (emphasis in original).

Elliot also opines, "In any event, even if [Newman was] correct that arbitration was mandatory, the worst that could have happened was that NationsBank would have filed a motion to require arbitration; and in that event, NationsBank would have had the burden of proving the necessity of arbitration." (PSOF Ex. 14 at 1.) Elliot thus urges that, believing the arbitral agreement to be enforceable, Newman should have filed in a judicial forum anyway, in the hopes that NationsBank would somehow fail or least expend considerable sums of money to specifically enforce the clause. (*Id.* Ex. 14 at 13.) Elliot does not aver that Cecala would have prevailed if her lawyer had followed this course of action. Aside from the fact it does not bolster Cecala's prima facie case for causation, this line of reasoning also is insuffi-

client as a matter of law for legal malpractice.

In *Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190 (7th Cir.1999), the court considered the issue of whether "the loss of a procedural advantage can give rise to a malpractice suit even if the advantage was not essential to the protection of the client's substantive rights." Judge Posner answered in the negative. The insurance company plaintiff sued its former counsel for negligently failing to obtain a jury trial in the underlying personal injury action, allegedly leading to a higher damage award. The court upheld dismissal for failure to prove damages.

> Through the defendants' negligence Jones and its insurer lost their right to a jury trial and were forced to submit to a bench trial—which means they got a trial before an authorized tribunal. They allege no error in the conduct of the trial by the judge whom they did not want to try the case, and they did not appeal from the judgment that he rendered, large as it was. The plaintiffs thus got a fair trial and there is no basis for supposing that the judgment was excessive. [W]e think ... a malpractice plaintiff cannot prevail merely by showing that his claim had some nuisance value. To impose malpractice liability for booting a nuisance suit would ... simply encourage nuisance suits, of which we have enough already.

*Id.* at 1192–92.

Cecala is asking the court to hold an attorney liable on the very theory rejected in *Jones Motor Company*.

### 5. Termination of the Representation

Elliot finally contends that Cecala would have won if she had not been forced to discharge lawyer Newman prior to the conclusion of the arbitration. According to Elliot, the termination of the attorney-client relationship prejudiced the merits of Cecala's case in three ways. First, Cecala was forced to represent herself during the October 1999 hearing dates. Although she presented evidence, Cecala was "no match" for the Bank's lawyer. (PSOF Ex. 16 at 10.) Second, Cecala's pro se representation was hamstrung by Newman's refusal to return the client file until 2000. (*Id.* at 12; Ex. 14 at 23; Doc. # 193 at 7.) Finally, Cecala was "unable to provide a closing argument or brief to the arbitration panel." (PSOF Ex. 16 at 10.) As a result, "the evidence in the record which could have provided a basis for a strong response to the bank's brief" went undiscovered. (*Id.* Ex. 16 at 10.) Elliot concludes, without more, "The failure to present a closing argument or brief insured the loss of Ms. Cecala's claims." (*Id.* Ex. 16 at 10.)

Like Elliot, the court is deeply troubled by Cecala's allegations of attorney misconduct. However, Elliot's untimely arguments fail as a matter of law to create a triable issue of loss causation because they are wholly lacking in foundation and are speculative to boot. The court takes it as true that Cecala was outgunned by the Bank's attorney during the October 1999 hearings. But the mere fact that Cecala appeared pro se does not suggest that the result on the merits would have been different if Newman had stayed on. Elliot is merely speculating about the harmful effect of Cecala's untrained presentation and legal argumentation upon neutral decision-makers, and this is insufficient as a matter of law to permit a jury to draw a reasonable inference of loss causation. In fact, the transcript from the final two hearings suggests that the panel went to great lengths to accommodate Cecala. They granted her a recess on October 19, 1999, for example, so that she could retrieve documents from the Charlotte airport, and

allowed her wide latitude in putting on her case in chief in innumerable other ways. (Doc. # 246 Ex. 2 at 100–10.)

Nor does Elliot articulate any specific reason why Cecala would have prevailed on the merits if Newman had returned the client file in time for the October hearing dates. He simply notes that Newman's demand for unpaid legal fees was unethical. (PSOF Ex. 14 at 23.) Cecala herself failed to identify anything in the client file that, if made available to her, would have changed the outcome of her case. (DSOF Cecala Dep. Jan. 5, 2007 p. 305.)

Finally, Elliot provides absolutely no factual support of his contention that Cecala's failure to present a closing argument or post-hearing brief "insured" the loss of her claims. He identifies no evidence that, if located and presented to the arbitrators at the close of the hearing, would have changed the outcome of the arbitration. The lack of substantiation is fatal to Elliot's claim. A fair-minded jury could not conclude that a reasonable arbitrator would have disregarded the substantive flaws in Cecala's case in favor of unidentified but supposedly dispositive evidence after 18 full days of litigation.

### D. Other Evidence of Causation

#### 1. Hostile Work Environment Sexual Harassment Claim

Cecala's Statement of Facts contains the following specific allegations of a hostile work environment: (1) vulgar language used by NationsBank employees that was demeaning to women, and Bank acquiescence to that conduct; (2) a visit from a male stripper in "late 1994 or early 1995"; (3) lack of Bank sensitivity training; and (4) unwelcome sexual advances by Mike Malone, a NationsBank executive. (PSOF 23–24.) Cecala supports these allegations primarily by citation to the transcript of the NASD arbitration.

In its closing brief, the Bank identified multiple factual inconsistencies in Cecala's claims of hostile work environment and sexual harassment, noted the lack of corroborating evidence to support the foregoing allegations, impeached Cecala's credibility as a witness, and raised an affirmative employer defense. (DSOF Ex. 11 at 25–47.)

Other than the Elliot affidavits considered and rejected above, Cecala marshals only one piece of evidence in support of her conclusion that reasonable arbitrators should have found in her favor on the claim of hostile work environment but for Newman's malpractice: the corroborating declaration from her cousin Teri Borton, whose testimony was excluded from the arbitration proceeding. (PSOF 24.) Ms. Borton's testimony is insufficient to create a triable issue of causation.

Cecala contends that her cousin Teri Borton was "on the witness list for the arbitration, was available to testify at the arbitration hearing, and had information about the Bank's executives' unwelcome advances towards Renee." (PSOF 24.) "The determination of whether the attorney's omission caused injury is tested by whether the omitted evidence should have provided a more advantageous result in the underlying action.... Omitted evidence must have a causal relationship to the claimed loss." 4 *Legal Malpractice* § 30:40 at 605–06; *see Rubens v. Mason,* 417 F.Supp.2d 262, 276 (S.D.N.Y.2006) (As to negligent failure to call a witness on summary judgment, "The argument fails, as a matter of law, for [defendant's] failure to call these witnesses was one of reasonable trial strategy, and in any event, a reasonable jury could not find that either witness would have changed the outcome of the arbitration.").

Failure to call Ms. Borton could not have caused the loss. The omitted evi-

dence was almost entirely self-serving hearsay—Ms. Borton's recitation of Cecala's statements that Mike Malone tried to manipulate her into a sexual relationship, and that Tom Neary, another NationsBank executive, made unwelcome sexual advances toward her. (PSOF Ex. 27 at 2.) This lacked independent evidentiary value. Ms. Borton recounts hearing Cecala's side of a phone call from Mike Malone *after* *Cecala resigned* in which he proposed a date. That was not evidence of hostile environment. It follows that Ms. Borton's declaration does not offer a "reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Purcell,* 18 Ariz. App. at 82, 500 P.2d at 342.

### 2. Disparate Treatment Claim

Cecala claimed that she was paid less than her male comparators, deprived of resources, and not promoted by NationsBank because of her sex. (DSOF Ex. 9 at 5; PSOF at 20–23.) Cecala substantiates this claim only by reference to Elliot's untimely affidavit and citation to the transcript from the underlying litigation. (*Id.* at 20–23.) The flaws in Elliot's "net opinion" need not be rehearsed here. Elliot simply takes the facts alleged by Cecala to be true and concludes on that basis alone that "the above facts establish [a] claim[ ] for ... hostile work environment." (*Id.* Ex. 16 at 16.) Cecala's reliance on the arbitration transcript is also misplaced.

The arbitration transcript demonstrates that, upon complaining of what she perceived to be discriminatory pay, a NationsBank executive offered to remedy Cecala's concerns by raising her compensation $10,000, placing her at the exact same pay level as Jim Sherrill, a male colleague whose educational background and work experience were in fact superior to that of Cecala. (RC–00988–99.) Cecala failed to identify any similarly situated male Bank employees who were paid more than she

was. (RC–00480.) Additionally, Cecala provided no credible support for her contention that the Bank failed to promote or withheld resources because of her sex. (RC–00565.)

Cecala's Notice of Filing Rule 56(c) Declarations included submissions from Jason Budd and Patrick Tadie. (Doc. # 224 Ex. 4–5.) Jason Budd says nothing about what he might have testified to if he had been called (*Id.* Ex. 4.) Patrick Tadie was prepared to testify in the NASD arbitration as to Cecala's skills as a deal manager, and also to the difference between Cecala's compensation and that of other investment bankers. (*Id.* Ex. 5 at 21–22.) But he says nothing about any male comparators.

In short, Cecala has identified no evidence in opposition to Newman's Motion that could lead a fair-minded jury to conclude that Newman's alleged malpractice, rather than the inherent weakness of Cecala's disparate treatment claim, caused the adverse arbitral award.

### 3. Evidence of Litigation Injury from Sexual Relationship

Cecala also contends that Newman's "self-serving, manipulative and predatory" sexual relationship caused her to lose her otherwise meritorious Title VII claims because it "interfered" with and "adversely affected" Newman's representation. (Doc. # 193 at 4–5.) But Cecala provides no factual support for this claim. Cecala has told the court when and where the sexual contact was alleged to have occurred. (PSOF 5–6) She then relies on Dr. Rutter and Professor Hazard to substantiate the causal connection between that conduct and the claimed litigation injury.

Dr. Rutter's testimony must be rejected at the outset as irrelevant. Dr. Rutter's affidavit speaks only to the fear, shame, loss of self-esteem, depression and post-traumatic stress experienced by Cecala as

a result of Newman's sexual misconduct. (*Id.* Ex. 9.) These conclusions are relevant only to the time-barred claim of psychological injury from willful fiduciary breach. Causation of litigation injury cannot be inferred from Dr. Rutter's testimony.

Professor Hazard's affidavit fares no better. According to him, Cecala's allegations of non-consensual sex, if true, may subject Newman to professional discipline in multiple jurisdictions. (*Id.* Ex. 11 at 2–6.) Professor Hazard's testimony may have some evidentiary value as to whether Newman breached the applicable standards of care and conduct. But Newman's Motion is directed to the absence of causation, and Professor Hazard provides nothing from which a jury could draw that critical inference.

For example, on the final page of his submission, Professor Hazard opines that Newman directed his attention to pursuing a sexual relationship rather "than preparing his client for testimony," which "directly affected his ability to represent [Cecala] competently and directly harmed Cecala's ability to participate in her case, both as a client and as a key witness." (*Id.* Ex. 11 at 8.) But he provides no factual foundation for this bare conclusion. *See Leap-Source,* 351 B.R. at 705.

■ Apart from its lack of foundation, Professor Hazard's affidavit is insufficient as a matter of law to generate a triable issue of material fact on causation. Malpractice liability does not attach for undistinguished representation, whatever its cause. *See McKnight,* 270 F.3d at 518. Professor Hazard's conclusion that Cecala should have prevailed in the underlying action but for Newman's sexual misconduct is inadmissible speculation about the effect of better trial preparation upon the merits of Cecala's case, and would be unhelpful to a malpractice jury.

## VIII. Failure to Assert Retaliation

■ Cecala finally contends that Newman's failure to bring a claim for retaliation against NationsBank deprived her of an opportunity to recover damages against NationsBank under Title VII. (Doc. # 67 ¶ 43; PSOF at 16, 18–19.) This argument does not survive summary judgment. Even if Newman was negligent in failing to urge Title VII retaliation, Cecala has failed to show that Newman's omission caused her to sustain much more than nominal damages, which it could not have been negligent to fail to pursue at a cost in attorney's fees that would dwarf any recovery.

■ The Supreme Court of Maine defined the elements of a "failure to plead" malpractice claim in *Niehoff v. Shankman & Assoc. Legal Center, P.A.,* 2000 ME 214, 763 A.2d 121 (2000). To survive summary judgment, the plaintiff-client must "demonstrate that there are facts in dispute which are sufficient to allow a jury to conclude that (1) the defendant-attorney was negligent in representation of the plaintiff; and (2) the attorney's negligence caused the plaintiff to lose an opportunity to achieve a result, favorable to the plaintiff, which (i) the law allows; and (ii) the facts generated by plaintiff . . . would support, if the facts were believed by the jury." 763 A.2d at 124.

### A. Retaliatory Acts

After lodging complaints about discriminatory pay, lack of resources, and a hostile work environment with NationsBank executives, Cecala contends that she (1) was interrogated about her grievances "within earshot of her coworkers" by Mr. Ellison, her supervisor, making her feel "embarrassed" and "uncomfortable"; (2) endured "aggressive, extremely rude, and extremely intimating" comments from Mr. Ellison and other Bank executives, such as an

admonition to "stop whining" about her compensation, and a command to "sit down, shut up, and sell" mortgage bonds; (3) received undeserved poor performance reviews from Bank executives; (4) rebuffed inquiries from male colleagues about her sexual involvement with other NationsBank employees and other sexual innuendo, which led her to request and receive a transfer to another department of the Bank; (5) felt that Bank management was refusing to redress her grievances; and (6) was "not given any accounts" and "went to work every day with nothing to do" for approximately two weeks, which left her feeling "frozen out" of the workplace and led her to tender her resignation. (PSOF 12, 18, Ex. 16 at 3–16; Doc. ## 193 at 3; 237 at 6; RC–00539–44.)

▮ Most of this evidence falls short of the standard for adverse employment action under Title VII. Cecala's allegations of verbal abuse and work-place hostility do not, as a matter of law, constitute retaliatory adverse employment actions. *See Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (Title VII does not establish a "general civility code" for the American workplace). Undeserved poor performance reports may state a claim for retaliation, if tangible harm results. *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987). No such harm from bad reviews is shown here. Cecala has offered no proof that she lost any pay from the undeserved poor performance evaluations, or that NationsBank disseminated them to other financial institutions. (RC–00754.) Significant denial of work opportunities may state a claim for retaliation. *See Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir.2004) (adverse employment action where employee endures "significantly diminished material responsibilities"); *Strother v. So. Cal. Permanente Med. Group,* 79 F.3d 859, 869 (9th Cir.1996) (noting that "mere ostracism in the workplace is not enough to show an adverse employment action," but finding that total exclusion of employee who opposed unlawful employment practices from everyday work activities presented a jury question).

Elliot opines that Newman breached the applicable standard of care in failing to assert the retaliation claim in the underlying action. (PSOF Ex. 14 at 14; Ex. 16 at 5–6, 16.) Cecala has made a prima facie case for retaliation, at least as to her contentions that the Bank "froze Renee out of the workplace." (*Id.* at 18.) If this were the end of the analysis, Cecala's prima facie showing would entitle her to trial on this malpractice claim.

However, this is not the end of the analysis. Any damage from the Bank's retaliatory adverse employment action was short-lived. Cecala had "nothing to do" for only two weeks before she voluntarily resigned in March 1997. Cecala's resignation is a supervening cause that limits her damages to the two-week period of retaliation testified to by her. Therefore, Cecala is entitled to little more than nominal damages on this omitted claim. *See 5–39 Larson on Employment Discrimination* § 93.09 (2d ed.1999); *Katz v. Dole,* 709 F.2d 251, 253 (4th Cir.1983) (Title VII claimants entitled to nominal damages).

### B. Constructive Discharge

▮ Cecala also charges Newman with negligence for failing to assert that Cecala was constructively discharged by NationsBank. (PSOF Ex. 14 at 14; Ex. 16 at 6–7.) Elliot opines that Newman's failure to allege constructive discharge caused Cecala to lose the opportunity to "seek damages for her termination" in the underlying action. (*Id.* Ex. 16 at 16) The constructive discharge is founded on the same unjustified performance evaluations and forced

isolation underlying Cecala's retaliation claim. (*Id.* Ex. 16 at 16.) Employee resignation in response to objectively unreasonable and intolerable retaliation on the part of the employer is the functional equivalent of a formal discharge for remedial purposes. *Pa. State Police v. Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). "Whether a plaintiff quit or was constructively discharged will determine whether he or she will be entitled to back pay and perhaps other remedies for the period following termination of employment." 1–15 *Larson on Employment Discrimination* § 15.08 (2d ed.1999). Thus, if Cecala were constructively discharged, her retaliation damages would not necessarily have been cut off by her resignation in March 1997. (PSOF Ex. 14 at 14.)

Whether Newman breached a legal duty in failing to assert claims for retaliation and constructive discharge, and whether Cecala would have prevailed if these arguments had been presented, must be assessed under the law of the Court of Appeals for the Fourth Circuit as of December 15, 1999, the deadline for filing post-hearing briefs with the NASD arbitrators. (Doc. # 246 Ex. 4 at 383.) "[T]he standard of care is not established by hindsight, but by the skills, knowledge and diligence that were appropriate at the time of the alleged act or omissions, not at the time of trial." 2 *Legal Malpractice* § 19:10 at 1230; *accord Smith v. Lewis*, 13 Cal.3d 349, 118 Cal.Rptr. 621, 625, 530 P.2d 589, 593 (1975) ("[T]he crucial inquiry is whether [the defendant-attorney's] advice was ... legally deficient when it was given. We must, therefore, examine the indicia of the law which were readily available to defendant at the time he performed the legal services in question.") (citations omitted).

### 1. Prima Facie Case for Constructive Discharge

■■■ In his untimely affidavit, Elliot acknowledges that constructive discharge is more difficult to prove than retaliation. (PSOF Ex. 16 at 16.) A prima facie case for retaliatory constructive discharge requires "something more" than actionable retaliation. *Suders*, 542 U.S. at 147, 124 S.Ct. 2342; *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 243 (4th Cir.1997) (retaliatory constructive discharge requires more than prima facie case of retaliatory adverse employment action); *see Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir.2000) ("Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job."). A constructive discharge claimant in the Fourth Circuit in late 1999 was also required to show that the employer "deliberately made his working conditions intolerable in an effort to induce him to quit." *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir.1995) (citation and internal quotations omitted); *Andrade v. Mayfair Mgmt.*, 88 F.3d 258, 262 (4th Cir.1996) (same). The Fourth Circuit articulated the "deliberateness" and "intolerability" requirements as follows.

"Deliberateness," defined as the specific intent to force the employee to leave, could be "shown by evidence that an employee's resignation was the reasonably foreseeable consequence of the employer's conduct. For example, intent may be inferred from a failure to act in the face of known intolerable conditions." *Amirmokri*, 60 F.3d at 1132–33 (citation omitted). The Fourth Circuit subscribed to a minority view in requiring proof of "deliberateness" as part of a prima facie case of constructive dis-

charge. *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir.1995) (comparing Fourth Circuit precedent to that of other federal circuits). The Supreme Court overruled the deliberateness requirement in 2004, but the *Suders* decision is irrelevant to the issue of Newman's malpractice in 1998 and 1999.

The Fourth Circuit's definition of "intolerability" reflected the majority view adopted by all federal circuits. "Intolerability of working conditions ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985). Constructive discharge cannot be triggered by the employee's subjective beliefs, no matter how sincerely held. *Id.* at 1255. The constructive discharge doctrine protects an employee "from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his coworkers." *Id.* at 1255. Recognizing that "[e]very job has its frustrations, challenges and disappointments," the Fourth Circuit, like all the courts of appeal, resisted attempts by claimants to transform the "employment discrimination laws ... into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." *Id.* at 1255. Thus, constructive discharge had no bearing on "universal workaday frustrations," which employees were expected to work out within the context of the employment relationship. *Id.* at 1255–56; *see Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 66 (5th Cir. 1980).

### 2. The Omitted Allegation of Constructive Discharge Is Not Economically Viable

Elliot's contention that Cecala would have recovered post-termination damages against NationsBank if Newman had alleged constructive discharge fails in light of these precedents. To prevail, Cecala would first have to surmount the Fourth Circuit's "deliberateness" requirement. The record shows that NationsBank executives affirmatively requested that Cecala *not* resign. (Doc. # 229 at 6 (citing Cecala's testimony regarding Bank supervisors' attempts to persuade her to stay on and resolve grievances internally).) It would have been difficult for Cecala to prove a specific intent to compel her to quit in the face of this direct evidence to the contrary. *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir.1989) (Wilkinson, J., dissenting), *vacated in part*, 900 F.2d 27 (4th Cir.1990) (en banc) (adopting panel dissenting opinion).

Even if Cecala could establish deliberateness, the working conditions described by her do not rise to the level of objective "intolerability." "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994) (citations and internal quotations omitted). Furthermore, the court has located no authority from the Fourth Circuit or any other federal circuit, whether prior to or post-*Suders*, where the denial of work opportunities for a relatively short period of time was considered so intolerable as to compel a reasonable person to resign. *See Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 273 (4th Cir. 2001) (Denying a claim for constructive discharge and noting that "co-worker ostracism [and] denial of management position ... would not have compelled the reasonable person to resign. These incidents might have made the workplace less enjoyable for the reasonable person, but not intolerable."). *Coffman v. Tracker Marine L.P.*, 141 F.3d 1241 (8th Cir.1998), is particularly instructive. The court held that the employee's ostracism and denial of

work opportunities did not rise to the level of constructive discharge. There was no constructive discharge because the Title VII claimant was not totally precluded from seeking redress within the context of her existing employment. "Although the proposed solution may not have been prompt and appropriate when viewed with the 20/20 lens of hindsight, [the employee] had an obligation to not jump to the conclusion that the attempt would not work and that her only reasonable option was to quit. Nor did she have the right to dictate how [the employer] would try to solve the problem." *Id.* at 1247–48.

The two-week denial of work opportunities and undeserved negative evaluations of which Cecala primarily complains were not so intolerable as to lead a reasonable person to the conclusion that quitting was the only way out. Newman cannot be liable for negligently failing to make an untenable argument for constructive discharge. *Niehoff,* 763 A.2d at 124.

### C. Failure to Mitigate

Furthermore, even assuming that a claim for continuing lost pay was available under the doctrine of constructive discharge, post-termination damages would nevertheless be foreclosed as a matter of law because Cecala failed to mitigate. It is no answer to say that the statutory duty to mitigate, 42 U.S.C. § 2000e–5(g)(1), does not apply because Newman never told Cecala about that duty. Cecala did not ask, so Newman had no obligation to tell her to "be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which [she] was discharged." *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1273 (4th Cir.1985); *Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). Cecala never told Newman anything about the Goldman Sachs mortgage finance position rejected by her shortly after her resignation from NationsBank.

(PSOF 2.) Cecala testified to the lost opportunity to mitigate during the arbitration:

> [T]hey said yes, we [really] want you to join [Goldman Sachs] .... [but] they made the compensation offer at the level that I got paid previously.... [W]hen we had the discussion about compensation, I had such strong feelings of what happened to me at NationsBank. I felt very taken advantage of. I felt mistreated. And I felt like if you did nothing else, [ ] at least compensate me fairly for what I contributed, and that didn't happen.... [Goldman Sachs was not] willing to make up the difference ... [and] it was a further punishment for me.... To this day, [Goldman Sachs has] invited me to work on whatever basis-they know I'm self-employed—[i]f I want to work on deals or what have you.... I'm not going to kid anybody—that was a huge possibility for me. But I felt like after what had just happened, I wasn't going to go in with that understanding, that I was going to be paid below ... what I was worth. I just felt like I'd had enough.

(RC–00748–49, 00755.)

 Whether an actual job offer was extended (Doc. # 224 Ex. 3) is of little moment where Cecala's own testimony establishes that she would not have accepted the equivalent position at Goldman Sachs without an increase in compensation. A Title VII claimant "forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied." *Brady,* 753 F.2d at 1273. That is exactly what happened here.

### D. Lost Opportunity to Recover Nominal Damages at a Net Loss to the Client Is Not Actionable Malpractice

The court has located no authority for the proposition that an attorney may be

liable in negligence for failing to assert a theoretically viable claim that would cost far more to prosecute than it would yield.

 *Niehoff* conditions "failure to plead" malpractice liability upon a lost opportunity to achieve a "favorable" result. 763 A.2d at 124. The Maine Supreme Court did not define the term "favorable," but it must be more than Pyrrhic victory. Negligence-based malpractice liability inures only if, in addition to establishing duty and breach of that duty by failing to assert a viable claim, the plaintiff-client demonstrates that the defendant-attorney's omission caused her to sustain *economic* damages. *Reed,* 183 Ariz. at 318, 903 P.2d at 626. The loss of an opportunity to assert an economically futile claim falls short of the damages required by settled legal malpractice doctrine. "[I]f there is no injury, there is no tort." *McKnight,* 270 F.3d at 519; *Schweizer,* 93 F.Supp.2d at 395–96 (damages from malpractice must be readily measurable in economic terms).

As it turns out, in the current posture of this malpractice litigation, the omitted claim for retaliation is uneconomic. It would be improper to put Newman into the Bank's shoes without reason to believe that Cecala sustained meaningful economic injury from Newman's failure to plead a retaliation claim. As the Supreme Court noted in a different context, "it follows from … settled principles [of Rule 56(c), Fed.R.Civ.P.] that if the factual context renders respondents' claim implausible-if the claim is one that simply makes no economic sense-respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

It is one of the services of lawyers to clients to counsel them against litigation without practical benefit to the client, even if the litigation has theoretical merit. A lawyer who led a client into major legal fee expenditures without prospect of net benefit to the client would be subject to ethical censure for doing so. Adding a retaliation claim would have been proper and strategically justified at the outset. But with the loss of the economically viable claims— in the arbitration and now in this malpractice litigation—Newman is left to be judged by his duties concerning non-economic claims. Omitting a claim for which the recovery could not match the expense of litigation cannot be negligence—nor could there be any net damage from it.

IT IS THEREFORE ORDERED that Defendants' Motion to Strike Cecala Declaration and Elliot Supplemental Affidavit (Doc. # 227) is treated as an objection to admission and is granted in part and denied in part. The Elliot Supplemental Affidavit is excluded, and the Cecala Declaration is not excluded.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. # 171) is granted. The court will delay ordering entry of judgment until conclusion of the previously ordered settlement conference (Doc. # 250).